WILLIAM SCHWEIKER *et al.*

*v.*

GEORGE HUSSER *et al.*

*Filed at Ottawa March 31, 1893.*

1. AGENCY—*delegation of power to sub-agent.* In the absence of any authority, either express or implied, to employ a sub-agent, the trust committed to the agent is to be presumed exclusively personal, and can not be delegated to another, so as to affect the rights of the principal. But this general rule is subject to be modified by the peculiar circumstances and necessities of each particular case, from which the power to delegate the authority may be inferred.

2. Thus, when, in the execution of the authority, an act is to be performed which is purely mechanical, ministerial or executive, involving no elements of judgment, discretion or skill, the power to delegate the performance of it to a sub-agent may be implied; so there are many cases where, from the nature of the duty or the circumstances under which it is to be performed, the employment of a sub-agent is imperatively necessary. In such cases the power to employ sub-agents will be implied.

3. RELIGIOUS SOCIETIES—*which of two rival conferences is the lawful one—how settled.* Where two rival bodies, each claiming to be the lawful annual conference, acting under a general conference, appoint a pastor of a church, the title of the claimants to the office of pastor will depend upon the question as to which of these rival bodies was in fact the regular and lawful annual conference of the association; and in determining this question recourse must be had to the constitution and laws of the denomination, and especially to the decisions on that subject by the supreme judicial, legislative and administrative power of the general conference, unless they are clearly and manifestly repugnant to the established laws of the denomination, which are binding upon the civil courts.

4. Section 71 of the fundamental law of a church association provided that the time and place of its general conference should be appointed by the bishops, with the consent of the majority of such conference, and that if there be no bishop present, the general conference should fix them by a majority of votes, or that the oldest annual conference should give the other annual conferences due notice of the time and place. At a regular general conference, in which all the annual conferences were represented, and in which all the bishops were present, a resolution was unanimously adopted fixing the time of

the meeting of the next general conference, and declaring that the matter of appointing the place of its meeting be referred to the board of publication, which board appointed Indianapolis as the place of meeting. The oldest annual conference appointed Philadelphia as the place, and a conference was held at both places: *Held,* that the conference held at Indianapolis was the regular and lawful conference, and *that its acts were legal and binding on the association.*

5. It did not appear that this action of the general conference was taken at the suggestion of the bishops, or that they, as a co-ordinate branch of the conference, formally suggested any appointment of the time or place for the concurrence of the majority of the conference, but as the resolution adopted received the unanimous assent of all the members of the body, the concurrence of the bishops therein will be implied, and it will be presumed the resolution was properly adopted.

6. SAME—*power to fix time and place for the meeting of the conference.* Under a law of a religious denomination that "the time and place of the general conference shall be appointed by the bishops, with the consent of the majority of the conference, and if there be no bishop present, the general conference shall do it by a majority of votes, or the oldest annual conference, who shall then give the other annual conferences due notice of the time and place," the right of the annual conference depends upon the absence of any bishop and the failure by the general conference to act upon the subject.

7. SAME—*right to delegate power to fix place of its meetings.* Where the laws of a religious denomination authorize the appointment of the time and place for holding its general conference by the bishops, with the consent of a majority of the general conference, and invest that body with power to make such rules and regulations as will enable it to execute the powers conferred upon it, the general conference, after fixing the time of its next meeting, may delegate to a commission the power to select the place of such meeting, that power not being strictly a legislative power; and the fact that such body has delegated such power, and the exercise of the power has been generally acquiesced in for several years, is entitled to great weight in determining the right of the body to commit the selection of the place of the meeting to a commission.

8. The place at which a conference shall hold its next session is purely an ecclesiastical matter, and has nothing to do with the internal polity of the denomination, and is one over which the association, through its lawfully constituted authorities, has supreme control. It stands upon substantially the same footing with matters of religious belief, of forms of worship or of ecclesiastical discipline, and it seems to be the settled rule that in matters of that character the decisions of the proper church tribunals are to be accepted as final, and are not subject to review by the civil courts.

9.  Whether the power to fix the place for the next meeting of a general conference is to be classed as legislative or administrative, there can be no doubt that it belongs to that class of powers which, by a very common legislative practice in this and other States, has been frequently delegated to commissions and other agencies. It can not be held that such power is incapable of delegation.

10.  SAME — *decisions as to church matters conclusive on the courts.* The decisions of the general conference of a religious denomination, properly convened, must, as to all ecclesiastical matters, be accepted as final and conclusive. So where that body holds that a judgment of suspension or expulsion rendered against a bishop is void, that conclusion must be adopted as true, and his right to preside at an annual conference and appoint pastors can not be questioned; and so, when the general conference holds that a bishop, if present, is a necessary element of every annual conference, that must be accepted as the law of the church by the courts.

11.  SAME—*expulsion of members.* The discipline of a church provided rules for the trials of members thereof, which required written charges to be preferred and a trial before a committee, and gave the quarterly conference jurisdiction only on appeal. It was claimed that certain members were expelled by the quarterly conference, but the evidence showed that no proceedings were instituted against them in the forms prescribed in the discipline, and failed to show any jurisdiction of the quarterly conference : *Held,* that there was nothing to show that such members had ever lost their membership.

12.  SAME — *office of pastor of a church — a property right.* Where there is no contract between a church and the pastor for any fixed, definite salary, but the discipline of the church provides for the payment of the pastor by voluntary contributions, this will secure to him such a reasonable compensation as to create in him a property right in the office of pastor, which a court of equity will recognize and protect.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

This was a bill in chancery, brought by George Husser and others against William Schweiker and others, to restrain the defendants from interfering with complainant Husser in acting as pastor of St. John's Society, known as Noble Street Church, Chicago, of the Evangelical Association of North America. The bill alleges that complainant Husser is the lawful pastor

26—146 ILL.

of the society; that defendant Schweiker is now acting as such pastor, but is not legally entitled to do so, and that the other defendants, who are the trustees of the society, support defendant Schweiker in his unlawful occupation of the pulpit, church and parsonage of the society, and exclude complainant Husser therefrom, and also exclude the other complainants, who are members of the society, and adhere to Husser as the lawful pastor, from worshiping in the church, with Husser as their pastor.

The Evangelical Association of North America is a religious denomination originally organized about the year 1800, among the German-speaking people of the State of Pennsylvania, by Jacob Albright. Since that time it has extended into various portions of the United States, including the State of Illinois, and to some extent to foreign countries, so that it now embraces twenty-five annual conferences, and has about 150,000 communicants. Albright had formerly been connected with the Methodist Episcopal Church, and the form of doctrine, discipline, organization and church government adopted by him and his associates for the religious body formed by them were to a very great degree patterned after those of the denomination of which he was formerly a member.

The Evangelical Association, as the bill alleges and as the evidence tends to show, is organized under the associated or connectional form of church government, having a formulated constitution or code of rules, known as the Discipline, and having a system of graded ecclesiastical executive, legislative and judicial bodies and officers, for the administration of its church laws and its internal affairs, in and by which rules and system of government, each local society or congregation is a subordinate member of the general organization, and all such bodies, officers and societies, as well as the individual members of the denomination, are subject to the provisions of the Discipline.

The various bodies, supreme and subordinate, which constitute the denominational organization, stated in the order of their priority, are, a General Conference, Annual Conferences, Quarterly Conferences, Societies or Congregations and Classes. The General Conference, in which is vested the supreme legislative, judicial and executive authority of the denomination, is a representative body, convening quadrennially, and being composed, in addition to the Bishops and certain other denominational officers who are *ex officio* members, of delegates selected by and representing the several Annual Conferences, the basis of representation being, one delegate for every fourteen members and for every fraction of seven or over, of the Annual Conferences. An Annual Conference is held each year in each of the several districts into which the territory occupied by the denomination is divided, and is composed of all the itinerant preachers within the respective districts who, by ordination, are in full connection with the ministry. In the selection of pastors for the various Societies or Congregations, the itinerant system is adopted, and the pastors are appointed each year at the Annual Conferences, the power of assigning pastors to their respective fields of labor being by the Discipline vested in the Bishop and presiding elders. It will thus be seen that the government of the denomination is essentially ecclesiastical, the laity, as such, having no seat or voice, by representation or otherwise, in either the Annual Conferences or the General Conference, and no control of the appointment of their pastors.

At each meeting of the General Conference Bishops are appointed to serve for the term of four years, their number being fixed each time at the discretion of the Conference. The Discipline provides that, at the General Conference, a Bishop shall preside, but if no Bishop is present, a presiding officer shall be elected by the Conference, and that Bishops present who are not in the chair shall be *ex officio* members, and that two-thirds of the aggregate number of delegates shall

constitute a quorum. Also, that "at Annual Conferences, a Bishop shall act as president. If there be no Bishop present, the Conference shall elect one of the elders chairman." Sections 73 and 74 of the Discipline are as follows:

"Sec. 73. The General Conference shall have power to make rules and arrangements for our church, under the following restrictions:

"1. The General Conference shall have no power to alter, detract from, or add to any of our Articles of Faith; except with regard to the governments of other nations.

"2. It shall have no power to alter any rules or forms of our Church Discipline (the rules of our temporal economy being excepted), unless such alterations are previously recommended by two-thirds of the members of (all the Annual Conferences, who may be present at the sessions of the same; whereupon the General Conference shall have power, by a majority of three-fourths of their votes, to alter any of our rules and forms, excepting the Articles of Faith. It shall also have power, by three-fourths of its votes, to recommend to the Annual Conferences an alteration of any of said rules and forms; and after such alteration shall have been approved by two-thirds of the members present at the sessions of all the Annual Conferences, it shall by our Bishops be declared a law, and introduced as such into our Church Discipline.

"Sec. 74. The General Conference is the supreme court of law in the church. It shall decide upon the legality of all acts of the Annual Conferences, and upon all such cases as may arise between the Annual Conferences, and such as may arise between any incorporated society of the church and its officers, or any Annual Conference; and in its judicial capacity, it shall decide, render verdict and declare judgment, only in such cases as are lawfully brought before it for adjudication.

"It shall have power to make such rules and regulations as will enable it to execute the powers conferred upon it."

Section 71 of the discipline is as follows:

"Sec. 71. The time and place of the General Conference shall be appointed by the Bishops, with the consent of a majority of the Conference; and if there be no Bishop present, the General Conference shall do it by a majority of votes, or the oldest Annual Conference, who then shall give the other Annual Conferences due notice of the time and place."

It is further provided by the Discipline, that the Bishops shall be amenable for their conduct to the General Conference, which shall have power, if circumstances require, to depose the Bishop from office, or expel him from the church. Also, that if a Bishop shall be accused, during the interval between the sessions of the Conference, of immoral conduct, three of the elders shall meet and examine him, and if they shall actually be of the opinion that he is guilty of the alleged crime, they shall call one or two presiding elders, and as many preachers standing in full connection as they may deem necessary, yet so that they be not less than seven in number, whereof at least one shall be a presiding elder. These are constituted a conference, who shall examine the charge alleged against the Bishop, and if two-thirds of the members thus called shall find him guilty of the charge brought against him, they shall have power to suspend him from office until the next General Conference, which shall then determine the whole matter. But a charge against a Bishop must be preferred in writing, and subscribed by those who are willing to substantiate the alleged crime, and the accused Bishop is to have a copy of the same.

A meeting of the General Conference was held at Buffalo, New York, in October, 1887, and no question is made by either party as to the regularity or validity of that body as the lawful General Conference. At that time three Bishops had been appointed and were in office, viz., Bishops Esher, Bowman and Dubbs, and all three were present and took part in the proceedings of the Conference, each presiding during portions

of the session. It had been usual on former occasions for different societies belonging to the denomination who desired to have the next session of the General Conference held with them, to present to the Conference invitations to that effect, and tender their hospitalities to its members. These invitations were considered by the Bishops and Conference in determining the place for the next meeting. At the Conference held at Buffalo in October, 1887, but one invitation of that character was received, and before the place for holding the next meeting was finally selected, that invitation was withdrawn. The Conference thereupon, by a unanimous vote, passed the following resolutions :

"*Resolved,* That the next meeting of the General Conference shall begin on the first Thursday of October, 1891.

"*Resolved,* That the matter of appointing the place of the next General Conference be referred to the Board of Publication."

The Board of Publication named in the second of these resolutions is an official board of the denomination, having charge of its book and publication department, and consisting of the Bishops, and eight other members, selected from the members of the Annual Conferences, one from each of eight districts into which the territory covered by the denomination was for that purpose divided. The adoption of these resolutions received the unanimous assent of all the members of the conference, including the three bishops, and at the close of the session, all the members caused their names to be signed to the minutes of the proceedings, in token of their assent to and approval thereof.

In October, 1890, the Board of Publication, in pursuance of the authority vested in them by the above resolution, fixed and appointed the place for the next meeting of the General Conference at Indianapolis, Indiana, and at once gave notice of their action in the newspapers of the denomination. Bishops Esher and Bowman were present at the meeting of the Board at which this action was taken, and both assented thereto.

In the meantime, serious controversies had arisen in the denomination, especially involving the three Bishops, and two parties were formed, one under the leadership of Bishop Dubbs and the other under that of Bishops Esher and Bowman. These controversies became quite bitter, and in the early part of the year 1890, they resulted in the preferring of accusations against each of the Bishops, and their trial and suspension from office, until the next meeting of the General Conference. Bishop Dubbs, upon his suspension, ceased to discharge the duties of his office of Bishop, but in the cases of Bishops Esher and Bowman, there seem to have been previous examinations by three elders as to the same accusations, and on such examinations the conclusion was reached that the accusations were unfounded, and Esher and Bowman, thereupon, assuming the position that there was no authority for a second examination upon the same charges, refused to submit to further examinations, or to obey the summons of the conference organized to try them, and they therefore failed to appear at their trials, and subsequently refused to recognize the validity of the judgments of suspension pronounced against them, and continued to perform the duties of their office.

The East Pennsylvania Conference, which claims to be the oldest Annual Conference, met in February, 1891. At that meeting Bishop Bowman appeared and applied for admission, but was forcibly excluded by the majority, whereupon about forty members, being a minority, protesting against Bishop Bowman's exclusion, and insisting that no valid Conference could be held without a Bishop so long as one was present, withdrew to another place and held a session with Bishop Bowman in the chair. The majority remained and passed resolutions, which set forth that the General Conference in 1887 had neglected to fix the place for its next meeting, and that thereby the duty of fixing such place devolved, by the provisions of the Discipline, upon the East Pennsylvania Conference, as the oldest Annual Conference, and fixing and ap-

pointing Philadelphia as the place for the next meeting of the General Conference.

Prior to October 1, 1891, the date fixed for the meeting of the General Conference, eighteen of the Annual Conferences had expressed their disapproval of the proceedings against Bishops Esher and Bowman, and had recognized them as being unaffected thereby. In five of the remaining seven Annual Conferences, the Illinois Conference being one, Bishop Esher or Bishop Bowman, having presented himself to the Conference and being excluded, a large number of the preachers left the Conference and proceeded to hold sessions elsewhere, under the presidency of one or the other of these Bishops. Only two of the Conferences adhered without division to the party of Bishop Dubbs.

Elections of delegates to the General Conference took place at the meetings of the Annual Conferences held in 1891. Eighteen of the Conferences were unanimously of the opinion that Indianapolis was the lawfully appointed place for holding the General Conference, and they accordingly elected and sent their delegates to the Conference to be held at that place. The total number of delegates selected by those eighteen Conferences was sixty-eight. In the five divided Conferences, delegates to the Indianapolis meeting were in like manner elected by those members who convened as Conferences under the presidency of Bishop Esher or Bishop Bowman. The total number of delegates thus elected was twenty-four, making in all ninety-two delegates elected to Indianapolis, and representing or claiming to represent in all twenty-three of the twenty-five Annual Conferences. Bishops Esher and Bowman, and all the other General officers of the church which by the Discipline were *ex officio* members of the General Conference, recognized Indianapolis as the proper and legal place for the meeting, and a sufficient number of them attended the Conference held at that place to make the total membership of that Conference one hundred.

The two Conferences which sent no delegates to Indianapolis elected fourteen delegates to Philadelphia, and thirty-one delegates were sent to Philadelphia from the five divided Conferences, making forty-five in all. None were sent to Philadelphia from the eighteen other Conferences. Bishop Dubbs also attended, thus making a total membership of forty-six.

The two rival Conferences met on the same day and held their sessions. At both, the matter of the proceedings against the three Bishops resulting in their suspension from office, and also the divisions in the five divided districts, came up for adjudication. At Philadelphia, Bishop Dubbs' suspension was declared wrongful and was set aside, and the proceedings against Bishops Esher and Bowman were approved and affirmed, and they were declared expelled from the church. The preachers in the divided districts who had excluded Bishops Esher and Bowman and organized Annual Conferences with presiding officers of their own selection, were recognized as the legal Annual Conferences. At Indianapolis, on the other hand, the proceedings against Bishops Esher and Bowman were reviewed at length, and declared to be void *ab initio*, and the Annual Conferences in the divided districts which had convened under the presidency of those Bishops were adjudged to constitute the only lawful Annual Conferences for those districts.

The decision of the Indianapolis Conference that the proceedings against Bishops Esher and Bowman were not only irregular but absolutely void *ab initio*, was based, among other things, upon the ground that the same charges against them had already been examined thoroughly and in good faith, by a committee of three elders, and that upon such examination, the charges were all ascertained to be wholly unfounded, it being declared as a law of the denomination, that such examination and finding made it unlawful for any other committee to re-examine them upon the same charges, and also made it their duty to refuse to submit to any further examinations;

and as the committee of elders who attempted to make the second examination, as well as the tribunal who assumed to try them, had full knowledge of the former examination and its result, their prosecution was wholly unauthorized and without jurisdiction. The proceeding against Bishop Esher was held to be without jurisdiction and void for the further reason, that the committee of elders who undertook to examine him, instead of going to Chicago, where the Bishop resided, and holding the examination there, as required by the laws and usages of the denomination, summoned him to appear before them at Reading, Pennsylvania, some 800 miles from his home, and where he was not bound to go. It was therefore held that the proceedings against these Bishops which resulted in judgments of suspension being void from the beginning, such judgments had in no way disqualified them for performing the duties of their office and that the Annual Conference had no power to exclude them from presiding. On this subject, the report of a committee to which the matter was referred was adopted by the Conference as embodying its views in relation thereto, the material parts of the committee's report being as follows :

"In the Conferences of Des Moines, Oregon, Illinois, Platte River, East Pennsylvania, Central Pennsylvania and Pittsburg, being seven in all, there have been divisions of greater or less magnitude, arising in each case from a refusal on the part of certain members of said Conferences, respectively, to recognize and treat Bishops Esher and Bowman as lawful Bishops of our church. In some cases such refusal has resulted in excluding the Bishops from the place appointed for the Conference, so as to necessitate their holding a Conference elsewhere ; in other cases it has resulted in a withdrawal of the members so refusing to recognize the presiding Bishop, and an attempt by such seceding members to hold an Annual Conference without participation of any Bishop.

"Under our church laws a Bishop, if present, is a necessary constituent element of every Annual Conference, not only as such, entitled to but bound by duty to participate in its proceedings as its chairman. The Bishop, at the Annual Conference, is the primary authority, with the power of final decision, in the matter of appointing and assigning preachers of the Conference to their respective fields of labor. For one constituent part of the body, viz., the preachers, to exclude the other part, the Bishop, is an act of usurpation. No Annual Conference in our church has ever had the power to pass upon the personal or official status or qualifications of our Bishops. No sentence or alleged sentence against a Bishop of our church is, or ever has been, subject to review or reconsideration in any form by an Annual Conference. The only reason alleged in the cases above referred to for the failure to recognize Bishops Esher and Bowman as lawful Bishops, entitled to preside over said Conferences, was, that they had respectively been suspended from office by proceedings at Chicago, (as to Bishop Bowman), and at Reading, (as to Bishop Esher). This Conference has already, at its present session, pronounced said proceedings, respectively, to have been not only irregular and unjust, but as absolutely void. If so, we do not see how any action based thereon can stand. Any one, whether preacher or layman, whether in his personal or official capacity, who may have undertaken to act upon the assumption that said proceedings were valid, did so at his peril, so far as legal consequences are concerned. Every member and preacher of this church is bound to know that such alleged sentences were of no legal force.

"Whatever excuse ignorance of the law may afford from a moral stand-point, such ignorance can furnish no ground whatever upon which to base the legality of any act. If these suspensions, so called, were absolutely void, they could not be made valid by any act or declaration of or by any Annual Conference, or any majority however considerable, of the

members thereof. When we consider further, that the exclusion of a Bishop from an Annual Conference upon any ground whatever, must practically result in putting into the hands of the preachers themselves, (or those who are elected by the Conference and from the Conference, and who are directly under the influence of their constituents), the power of appointing themselves pastors over the laity, it is obvious that to entrust to an Annual Conference the power, by majority vote or otherwise, of determining the validity of such suspensions, would be subversive of those fundamental principles of our church constitution, which puts the appointment of pastors in the hands of an agent who is as far as possible independent of the Annual Conference itself.

"It is plain, therefore, that those of our brethren in the Conferences hereinbefore named, who attempted to organize without a Bishop, when a Bishop was present and ready and able to act, were proceeding unlawfully from the beginning, and are not and were not entitled to recognition by the church, whether clergy or laity, as constituting Annual Conferences of the Evangelical Association. All the proceedings of such bodies, so unlawfully organized, their appointment of pastors, their election of presiding elders, their selection of time and place for any succeeding Conferences, etc., necessarily fall to the ground, as having no legal force or effect."

On adopting the foregoing report as a correct exposition of the laws and usages of the church, and of the judgment of the General Conference in relation to the proceedings against the Bishops, and the nullity of the judgment of suspension pronounced against them, a resolution was adopted, in substance, that the Annual Conferences held in the district of Illinois under the presidency of Bishop Esher in 1890 and 1891, and in the other divided districts under the presidency of Bishops Esher and Bowman, were respectively the lawful and regular, and the only lawful and regular, Annual Conferences in and for those districts during those years; that the acts and pro-

ceedings of those bodies were lawful and regular, as the acts and proceedings of the Annual Conferences of the church, and that the appointments of preachers made by the Conferences so organized under the Bishops, are and were the only regular and valid appointments in and for those districts.

At the meeting of the Illinois Conference held in April, 1890, Bishop Esher presented himself, but was refused admission, whereupon a portion of the preachers present repaired with the Bishop to another place, where an Annual Conference was organized and held under the presidency of the Bishop. Those remaining also organized as an Annual Conference, with a chairman of their own selection. In April, 1891, the same thing in substance was repeated, and two Annual Conferences were held, one presided over by Bishop Esher, and the other organized with a chairman selected from their own number. At the Conference thus presided over by Bishop Esher in April, 1891, complainant Husser was appointed preacher and pastor of St. John's Society, and defendant Schweiker was at the same time appointed preacher and pastor of the same society by the rival Annual Conference held in the absence of a Bishop.

The cause being heard on pleadings and proofs, the court found and held, that the General Conference held in Indianapolis in October, 1891, was the true and only lawful General Conference of the Evangelical Association held during that year; that the Annual Conference held in Illinois in April, 1891, under the presidency of Bishop Esher, was the true and lawful Illinois Annual Conference of the Association for that year, and that the appointment of complainant Husser by that Conference as pastor of St. John's Society, was the true and only lawful pastoral appointment to that society for the year. A decree was thereupon rendered, perpetually enjoining and restraining defendant Schweiker from interfering with complainant Husser in the discharge of his duties as the duly appointed pastor of that society, or in the occupancy, as such

pastor, of the church edifice of the society, and from attempting to act himself as pastor, and perpetually enjoining all the defendants from interfering with the free access of the other complainants to the church edifice.

On appeal to the Appellate Court, the decree was affirmed, and this appeal is from the judgment of affirmance.

Mr. A. M. PENCE, for the appellants.

Messrs. JUDD, RITCHIE & ESHER, for the appellees.

Mr. CHIEF JUSTICE BAILEY delivered the opinion of the Court:

The present suit grows out of the unfortunate controversy which, for the last three or four years, has divided the members of the Evangelical Association of North America into two contending factions. George Husser, one of the complainants, and William Schweiker, one of the defendants, are both itinerant preachers of the Evangelical Association, and both claim to have been regularly appointed by the Illinois Annual Conference to the position of pastor of St. John's Society, Chicago, one of the congregations belonging to the Association. Their appointments, as the evidence shows, were made at the same time, but they were made by the president or chairman and presiding elders of two rival bodies, each claiming to be the regular and lawful Illinois Annual Conference. Schweiker received his appointment from the body which refused to recognize Bishop Esher as the lawful bishop of the church and organized with a presiding officer of its own selection, and on receiving his appointment, he was admitted by the trustees of the congregation to the church building and parsonage, and was permitted to enter upon the performance of the duties and the enjoyment of the rights pertaining to the office of pastor, and was in possession thereof at the time the bill was filed. Husser received his appointment from the Annual Conference composed of those preachers who adhered to Bishop Esher and was presided over by him, and he claims to be

therefore the only regular and lawful appointee as pastor, and is seeking by his bill to be admitted to the office, and to have Schweiker and the other defendants restrained from interfering with him in the performance of its duties and in the enjoyment of the rights and benefits pertaining thereto.

Assuming that, as the Evangelical Association is constituted, there can be but one body lawfully entitled to be recognized as the Illinois Annual Conference, the title of these two claimants to the office of pastor must obviously depend upon the question as to which of these two rival bodies was in fact the regular and lawful Annual Conference of the Association. In determining this question, recourse must be had to the constitution and laws of the denomination, and especially to the decisions on that subject of the supreme judicial, legislative and administrative authority of the denomination, the General Conference. If such decisions can be found, unless they are clearly and manifestly repugnant to the established laws of the denomination, they are binding and conclusive upon the civil courts, and must be followed in the determination of such property rights as those courts may be called upon to adjudicate. But unfortunately, at the time fixed for the last quadrennial session of the General Conference, viz., in October, 1891, two rival bodies were convened, one at Philadelphia and the other at Indianapolis, both claiming to be the regular and lawful General Conference, and both undertook to adjudicate, among other things, upon the regularity and legality of the rival Annual Conferences in Illinois, and reached precisely opposite conclusions. The decision of the Conference held at Philadelphia was in favor of the Annual Conference by which Schweiker was appointed, and that of the one sitting at Indianapolis sustained the legality of the body from which Husser holds his appointment. The question then upon which the decision of the case must ultimately depend is, whether the Philadelphia or the Indianapolis Conference was the regular and lawful General Conference of the Association.

The determination of this question depends largely if not entirely upon the construction and force to be given to section 71 of the fundamental law of the association known as the Discipline, and upon whether, under that section, the General Conference, at its quadrennial session at Buffalo in October, 1887, after fixing the time for its next meeting, had the power to delegate to its Board of Publication, the matter of selecting and appointing the place for such meeting. The learned counsel for the defendants, in his brief, says that the construction of this section is substantially the only question involved in the case, and in this admission the counsel for the complainants fully concur. It is upon the theory that this is substantially the only question calling for decision, that the case has been argued and submitted on both sides, and in view of this fact, our consideration of it may be kept within a much narrower range than might otherwise have been deemed necessary. Section 71 is as follows:

"The time and place of the General Conference shall be appointed by the Bishops, with the consent of the majority of the Conference; and if there be no Bishop present, the General Conference shall do it by a majority of votes, or the oldest Annual Conference, who shall then give the other Annual Conferences due notice of the time and place."

No question is made as to the validity of the Buffalo Conference, that being practically admitted by all parties. All the Annual Conferences seem to have been represented, and all the Bishops were present, and each presided during portions of the session. That body undertook to exercise the power vested in it by section 71, and went so far as to appoint the time for its next meeting, but for reasons which seemed to the Conference to be sufficient, it passed a resolution referring the matter of appointing the place for the meeting to the Board of Publication. True, it does not appear that this action was taken at the suggestion of the Bishops, or that they, as a co-ordinate branch of the Conference, formally sub-

mitted any appointment of the time or place for the concurrence of the majority of the Conference, but the resolutions adopted received the unanimous assent of all the members of the body, and as the Bishops were members and were present, their concurrence in the resolutions will necessarily be implied. The action that was taken then, though not technically the action of the Bishops consented to by a majority of the Conference, may be fairly regarded as having been taken under the first clause of section 71, it being shown, presumptively at least, that it was the joint action of the Bishops and Conference.

In October, 1890, the Board of Publication met, and in performance of the duty committed to it by the General Conference, selected and appointed Indianapolis as the place of meeting, and gave due notice of their action in that behalf to the several Annual Conferences. Bishops Esher and Bowman, who were *ex officio* members of the Board, were present and assented to its action. In the following February, that portion of the members of the East Pennsylvania Conference which had forcibly excluded Bishop Bowman and organized as an Annual Conference with a chairman of their own selection, ignored what had been done by the Board of Publication, and assuming to sit in judgment upon the resolution of the General Conference committing the matter of appointing the place for its meeting to that Board, and to hold such resolution to have been adopted without authority and to be therefore illegal and void, undertook to act by virtue of the power vested in the oldest Annual Conference by section 71 of the Discipline, as though no action had been taken in the premises by the General Conference, and appointed Philadelphia as the place of meeting.

In attempting to construe section 71, it is scarcely necessary to remark that the language of the section is very brief and somewhat elliptical, and that the true meaning to be given to it, especially as applied to the questions now under

27—146 ILL.

consideration, is not altogether clear. . The mode in which the time and place of the next meeting is to be appointed is not specifically defined, except that the appointment is to be made by the Bishops with the concurrence of a majority of the Conference, or, in case no Bishop is present, then by a majority of the votes of the General Conference, or by the oldest Annual Conference. But there is nothing in the language used, at least when considered apart from the particular nature of the act to be performed, which would seem to forbid the use by the Bishops, the General Conference, or the oldest Annual Conference, whichever happened to be called upon to act, of any appropriate agencies or instrumentalities to aid in the performance of the duty thus imposed. The want of power to delegate the performance of the duty to an executive board or committee, if any such want of power existed, would seem to have arisen, not from the language in which the power is conferred, but from the nature of the power itself. But this point will be considered more fully hereafter.

It is very manifest, however, that the circumstances under which the power to make the appointment was to devolve upon the oldest Annual Conference are not clearly indicated, or at least, if the language is to be taken literally, the result is fatal to the right of the East Pennsylvania Conference to act. It is not pretended that the oldest Annual Conference had any inherent power in the premises, or that its power to act could be sustained by any other provision of the Discipline. Remembering then that the East Pennsylvania Conference must find the warrant for its action in this section alone, it is difficult to see how, under the facts shown in this case and about which there is no dispute, a case is presented from which its power to act could arise. And this is so, whether the delegation of the power by the General Conference to the Board of Publication is held to be valid or not.

If we invoke the same rules of interpretation which are ordinarily applied to statutes and other legal documents, it

would seem that the power to fix the time and place of the next meeting of the General Conference was not and was not intended to be devolved upon the oldest Annual Conference, except in case no Bishop was present at the meeting of the General Conference. Such would appear to be the clear reading of the section. But all three of the Bishops were present at the Buffalo General Conference and participated in its action, so far as it went. It will scarcely do to say that, assuming that the delegation of the power to the Board of Publication was void, the power to act devolved upon the oldest Annual Conference as a matter of necessity, as otherwise the General Conference would have lapsed for want of a duly appointed place at which to hold its session. The power of the oldest Annual Conference to act did not and could not arise *ex vi necessitate*, but only from the express terms of section 71, and the circumstance upon which the power was given by that section, viz., the absence of all the Bishops from the General Conference, not having arisen, it would seem to follow that the power itself could not have existed.

It may be further suggested as a pertinent consideration, that the appointment of the time and place of the next meeting are coupled together in the section as pertaining to the same subject matter, and as constituting essentially one act, and the power to perform it seems to have been conferred upon the oldest Annual Conference only in the event of a failure by the Bishops and by the General Conference to act upon the matter at all. But there was no such failure. The matter was considered and acted upon, both by the Bishops and the members of the Conference, and such action proceeded to the extent of appointing the time for the next meeting, and the delegation of the matter of selecting the place to the Board of Publication. But even if it can be held to be the intention of section 71 to authorize the oldest Annual Conference to interpose when the matter had been partly or imperfectly performed or disposed of by the General Conference and sup-

plement its action, it is plain that in this case, if the action of the General Conference was valid, the whole matter was disposed of and nothing remained to be done. Action by the oldest Annual Conference, under these circumstances, involved, as a necessary prerequisite, the power to review the action of the General Conference and pronounce it illegal, inoperative and void. Power to a subordinate body to sit in judgment upon the action of its superior will not be presumed, nor will it be held to exist, unless it is conferred in terms which are perfectly clear and unmistakable. We find nothing in the terms of section 71 which lends any countenance to the view that such power was intended to be conferred upon the East Pennsylvania Conference.

It appears therefore from these considerations, that, whatever may be said of the Indianapolis Conference, it is very difficult, if not impossible, to sustain the legality of the Conference held at Philadelphia. To hold that Conference legal and valid would necessitate a construction of section 71 which its language does not seem to warrant, or would even require the interpolation of provisions which the section does not contain. But as complainant Husser is seeking to enforce a title the validity of which is dependent upon the legality of the Indianapolis Conference, it does not answer the exigencies of his case to show merely that the Philadelphia Conference was invalid and illegitimate. His right to have the decree sustained depends upon whether the Conference held at Indianapolis was, rather than upon whether the one held at Philadelphia was not, the regular and lawful General Conference of the Evangelical Association.

The ground upon which the Indianapolis Conference is assailed is, that Indianapolis was not appointed as the place of meeting by virtue of any lawful authority. This objection is sought to be based upon two propositions, first, that section 71 expressly prescribes the agents by whom and the manner in which the time and place of the next meeting should be

appointed, and that an appointment by any other agency or in any other manner was thereby impliedly prohibited; and, secondly, that the appointment of the time and place of the next meeting was essentially a legislative act, and that such legislative power, being committed to the Bishops and a majority of the Conference, could be exercised only by them in person, and was incapable of being delegated to any other agency.

It will readily be seen that these two grounds of objection, though stated and argued separately, involve substantially the same proposition, viz., that the power of appointing the time and place of the next meeting was incapable of delegation, the necessity for its personal exercise by the agencies to whom it was committed by section 71 arising, both from the mode in which the power was conferred, and from the nature of the power itself. But, as we have already said, there is nothing in the language by which the power is conferred, when considered apart from the nature of the power, which, so far as we can see, is at all decisive of the necessity for its personal exercise.

Upon this point, we have only to consider the first clause of section 71, viz., that "the time and place of the General Conference shall be appointed by the Bishops, with the consent of the majority of the Conference." The remaining portions of the section, so far as this point is concerned, are unimportant. They were not operative unless there was a failure by the Bishops and the majority of the Conference to make a valid appointment, and that being the very question to be determined, those provisions can not be considered in determining it.

Now it is plain that the clause above quoted merely conferred upon the Bishops and a majority of the Conference the power and made it their duty to appoint the time and place of the next meeting, but there is an absence of any direction as to the mode in which the power should be exercised. That,

so far as is indicated by the language alone, was left wholly to their discretion. It can not be doubted, we think, that if a duty purely administrative, and not involving the exercise of judgment or discretion, had been imposed upon the Bishops and Conference in precisely the same terms, their power to employ for its performance any suitable agency would have followed as a necessary incident. Thus, if it had been provided that the Bishops, with the consent of a majority of the Conference, should proceed to build, at a designated place, a suitable edifice to serve the purpose of an assembly hall in, which to hold future sessions of the General Conference, no one, we think, would insist that the duty would be one which the Bishops and a majority of the Conference would have had to perform in person, but all would agree, not only that it might, but that it necessarily would have had to be delegated to others. This being so, the only question here would seem to be, whether the power to appoint the place for the next meeting was one which, in its nature, was incapable of being delegated.

It is a general rule of the law of agency, that in the absence of any authority, either express or implied, to employ a sub-agent, the trust committed to the agent is presumed to be exclusively personal, and can not be delegated to another, so as to affect the rights of the principal. But this general rule is subject to be modified by the peculiar circumstances and necessities of each particular case, from which the power to delegate the authority may be inferred. Thus, where in the execution of the authority, an act is to be performed which is purely mechanical, ministerial or executive, involving no elements of judgment, discretion or skill, the power to delegate the performance of it to a sub-agent may be implied. There are also many cases where, from the very nature of the duty, or the circumstances under which it is to be performed, the employment of sub-agents is imperatively necessary, since the principal's interests would suffer if they were not so employed.

In such cases the power to employ the necessary sub-agents will be implied. The employment of sub-agents may also be justified by a known and established usage and course of dealing. Mechem on Agency, secs. 184-195.

But these rules which undoubtedly obtain in case of ordinary agencies, can have only a qualified application to the exercise of its constitutional powers by the governing body of a religious denomination. The General Conference of the Evangelical Association can not be said to have sustained the relation of agent to a principal, or of subordinate to a superior, but was, subject only to the limitations imposed by the Discipline, the supreme executive, legislative and judicial authority of the denomination. And not only was it vested with the supreme power, but it had a very broad discretion as to the mode in which those powers should be exercised. The Discipline, after vesting it with its jurisdiction in matters executive, legislative and judicial, the power under consideration being one of those conferred, provided that, "It shall have power to make such rules and regulations as will enable it to execute the powers conferred upon it." The relations of the General Conference to the denomination then must be determined, not so much by those rules which are applicable to the relation of principal and agent, as by those which should apply to a governing body, vested with the supreme executive, legislative and judicial authority, and limited only by the terms of a written Constitution.

In this view, the main contention is, that the power to appoint the place for the meeting of the General Conference was legislative, and that legislative power is in its nature a personal trust, which must be exercised by the body upon which it is conferred, and that its delegation is necessarily unlawful. It may be observed that it is not always easy to distinguish between those powers which are legislative and those which are only executive or administrative. Legislative bodies are often called upon to perform acts which, if not purely admin-

istrative, partake of that nature. And it is especially difficult, in cases like the present, where legislative and administrative powers are vested in the same body, to determine whether a particular power belongs to one or the other of these departments. If we attempt to classify the power in question, we think it can hardly be said to be distinctively legislative or administrative, but it seems rather to partake to some extent of the character of both. The mere act of appointing the place of meeting may perhaps be regarded as legislative, but the selection of the particular congregation with which to hold the session, if not purely administrative, was largely of that nature. Before such selection could be wisely or judiciously made, various preliminary questions had to be investigated, and various arrangements had to be made. The convenience of the various delegates who were expected to attend had to be ascertained and properly provided for. It will not be presumed that the General Conference would have been disposed in any event to force itself upon the hospitalities of an unwilling congregation, and it was necessary therefore to find a congregation, conveniently located and reasonably accessible, whose house of worship would conveniently accommodate the Conference, and whose members were disposed to receive the delegates and extend to them their hospitalities. No such congregation presented itself during the session at Buffalo, the only one from which an invitation had been received having withdrawn the invitation before the appointment of a place for the next meeting had been considered. Under these circumstances, the General Conference was not prepared to act intelligently if at all. Before the place could be judiciously appointed, a suitable one had to be found, and suitable arrangements to secure the proper accommodation of the Conference and its members had to be made, and that necessarily involved negotiations, inquiries and preparations, which clearly were matters of an administrative character.

It is no doubt the general rule that legislative powers can not be delegated. This, however, as will hereafter be shown, is by no means a universal rule. It is not unusual for legislative bodies to delegate to commissions or other similar agencies, the details of matters which they can not conveniently attend to themselves, and which can be more advantageously considered and performed by a commission, and the legality of their doing so can not be successfully questioned.

In determining whether the matter of appointing the place for the meeting of the next General Conference was one which could be thus delegated to the Board of Publication, great deference is due to the decision of the Conference itself, to be implied from the very act of making the delegation, that the matter could be properly committed to such Board. Being the supreme legislative and administrative as well as judicial body, it had the power and it became its duty, in each instance, to determine its own authority to act, and its conclusions in relation thereto are entitled to great weight, if they are not indeed conclusive upon the civil courts. Unless then they were manifestly violative of the constitution or laws of the Association, or in clear and palpable excess of its own jurisdiction, they are not subject to review by courts of equity, and must be held to be in accordance with the true exposition of the rules established for the regulation and government of its action.

As bearing upon the same point, considerable weight is also to be given to the fact that so large a proportion of the members of the denomination concurred in the action of the General Conference. Eighteen of the twenty-five Annual Conferences recognized its validity by sending their delegates to the General Conference appointed to be held at Indianapolis, and similar action was taken by the very considerable minority of the members of five of the remaining seven Annual Conferences which adhered to Bishops Esher and Bowman. In addition to this, two of the three Bishops, and all the other

general officers of the Association who were *ex officio* members of the General Conference, recognized the validity of the action of the Board of Publication in appointing the place of meeting. These various Conferences and members thus concurring were presumably familiar with the laws and usages of the denomination, and their action thus taken under the sanction of their official responsibility, furnishes strong evidence that, in their judgment at least, the General Conference had not transcended its appropriate jurisdiction in committing the selection of the place of meeting to the Board of Publication.

It is not improper to also notice in this connection the fact that, for nearly three years and a half after the action of the General Conference committing the matter of selecting the place of meeting to the Board of Publication, the legality or propriety of such action was not called in question by any one, but, so far as appears, received the general acquiescence of all parties. It was not until a bitter controversy had arisen dividing the members of the denomination into two hostile factions, that the place of meeting came to be regarded as a matter of serious consequence. Then, for the first time, as it would seem, it became material, in the judgment of those who were opposed to Bishops Esher and Bowman and the Board of Publication, to have the next session of the General Conference held at a point which should be largely dominated by the influence of members of their own party, and they thereupon, some four months after the place of meeting had been fixed at Indianapolis, claimed to have discovered that the power of the Board of Publication in that behalf was technically, or perhaps substantially, defective, and so caused action to be taken by the body which assumed to be the oldest Annual Conference, and had Philadelphia selected instead as the place of meeting.

It may also be observed that the delegation by the Buffalo Conference to its Board of Publication of the matter of select-

ing the place for its next meeting, finds very considerable support in the practice in that respect which had obtained on former occasions. Thus, in 1863, 1867 and 1879, the General Conference designated a particular city or town as the place of meeting, leaving it to the local bodies to appoint the particular church with which the session should be held. In like manner, in 1874, a resolution was adopted fixing the place for the next session, but expressly leaving it to the Illinois Annual Conference to designate the particular church with which the session should be held. In all these cases, the Conference was held with the particular church thus designated. In 1839, the General Conference designated as the place for its next session Tabor District, a district within the bounds of the Ohio Annual Conference embracing a very considerable extent of territory and containing many churches and preaching circuits. The Annual Conference of Ohio, at its last session preceding the time for holding the next General Conference, passed a resolution designating a particular church building within Tabor District as the place for its session, and the General Conference was held at the place thus appointed. The evidence shows that a similar practice has prevailed to a very considerable extent in the matter of appointing the place of holding the various Annual Conferences, and that its validity has not been questioned. Substantially the same thing seems to be true in case of other churches acting under a similar organization and polity, and notably, in case of the Methodist Episcopal Church, whose rules and form of organization are in most respects substantially identical with those of the Evangelical Association.

It will thus be seen, that the propriety and legality of the action of the General Conference in committing the matter of selecting the place for its next meeting to the Board of Publication, is sustained by the judgment and opinion of the Conference itself, by the general concensus of opinion among the members of the denomination, and to a certain extent at

least, by a practice, the lawfulness of which had never been questioned. It would not be carrying the rule beyond what seems to be supported by many of the authorities to hold, that the judgment of the Conference as to the construction of the Discipline and the extent of its own powers in this particular matter was conclusive. It is true the question was not brought before the Conference in any case to be decided by it in its judicial capacity. But in the exercise of its legislative and ministerial functions, questions were necessarily presented as to the nature and extent of its own powers, and which had to be decided before action could be taken, and it is difficult to see why its decisions thus made should not be regarded as precisely as solemn and authentic as those rendered when acting technically as a judicial body. Whatever may be said of the conclusive effect of the decisions of church authorities or tribunals directly affecting property rights, it seems plain that a decision relating merely to the mode of appointing the place for the next meeting of the General Conference can not be regarded as properly belonging to that class. The place at which the Conference shall hold its next session is purely an ecclesiastical matter, and has to do merely with the internal polity of the denomination, and is one over which the Association, through its lawfully constituted authorities, has supreme control. It stands upon substantially the same footing with matters of religious belief, of forms of worship, or of ecclesiastical discipline, and it seems to be the well settled rule that, in matters of that character, the decisions of the proper church tribunals are to be accepted as final, and are not subject to review by the civil courts. *Chase* v. *Cheney*, 58 Ill. 509; *Watson* v. *Jones*, 13 Wall. 679; *Goff* v. *Greer*, 88 Ind. 122; *White Lick Quarterly Meeting* v. *White Lick Quarterly Meeting*, 89 id. 136. It is difficult then to see how the construction put by the Buffalo Conference upon the provisions of section 71 of the Discipline, or its action based upon such construction, can be properly reviewed in this proceeding.

We are not disposed, however, to rest our decision upon this ground. [ Let it be conceded that the construction put upon section 71 by the General Conference is not conclusive, and that the proper construction to be given to the section is still open for consideration in this court. ] But even then it must be admitted, as we have already remarked, that great weight should be given to what seems to have been the deliberate and unanimous judgment of the Conference, supported as it was by precedent, and subsequently concurred in by so large a proportion of the members of the denomination.

Whether the power to fix the place for the next meeting of the General Conference is to be classed as legislative or administrative, there can be no doubt that it belongs to that class of powers which, by a very common legislative practice in this and other States, has been frequently delegated to commissions and other similar agencies, and that such practice, which doubtless has had its origin in considerations of convenience, has received general acquiescence from all departments of government, and whenever made a subject of judicial investigation, has been sustained.

The case of *Territory of Dakota* v. *Scott et al.* 3 Dakota, 357, is strongly in point. There the territorial legislature had passed an act providing that the seat of government of the Territory be removed from Yankton, and be located and established in the manner therein provided. It then named certain persons as commissioners for the purpose of locating the permanent seat of government and capital building of the Territory, and authorized them to "select a suitable site for the seat of government, due regard being had to its accessibility from all portions of the Territory, and its general fitness for a capital." The validity of this act was contested on the ground, among other things, that the power thus attempted to be delegated was distinctively legislative in its character, involving the exercise of discretion in a matter concerning the public, and was therefore incapable of delegation. The court, in

holding that the act was not subject to the objection thus urged, said:

"We are of the opinion that, if not wholly administrative, so much, at least, of the act in question as relates to the selection of a new site and the erection of suitable buildings and improvements thereon, is clearly of an administrative character. The legislative will that the seat of government be removed, that it be located and established as in the act provided, and that the site selected and determined upon by the commissioners, in pursuance of the provisions of the act, shall be the permanent seat of government of the territory, is definitely expressed in the act itself. The undoubtedly important and responsible duties of selection and preparation for occupancy were delegated to these commissioners. The convenience of such delegation, the obvious difficulties in the way of a direct selection by the legislature, have already been alluded to. What legal principle is contravened by the delegation of this power? The legislature made the law. Every act done under it by these commissioners is done in pursuance and by authority of the law and derives its sole validity therefrom, and when done, it is to be regarded as the act of the legislature itself." Reference is made in one of the opinions filed to the fact that the State of Nebraska located its capital in a similar way by means of a commission.

In *People* v. *Dunn*, 80 Cal. 211, the same objection was made to a statute which delegated to a commission the selection of a permanent site for a certain State charitable institution, and on this point the court said: "Nor do we think there is any force in the objection that, by providing that certain persons should select the site for the building proposed to be constructed, the act attempted to delegate legislative functions and powers. To hold that such powers could not be vested in persons named in the act would be an unreasonably strict application of the rule that legislative functions

can not be delegated. The mere act of selecting a site to be purchased was not a legislative act."

In *Rice* v. *Shay*, 43 Mich. 380, the legislature, in organizing a county, provided that the county seat should be located within a certain township, and appointed commissioners to locate the same, and the validity of the act being questioned on the same ground, it was sustained. In *State* v. *C. M. & St. P. R. R. Co.* 38 Minn. 281, it was insisted that an act appointing a board of railway commissioners and authorizing them to establish rates of charges for transportation of property, was a delegation of legislative power and therefore invalid. The question thus raised was elaborately considered, and in sustaining the validity of the statute, the court, among other things, said:

"It is not every grant of powers, involving the exercise of discretion and judgment, to executive or administrative officers, that amounts to a delegation of legislative power. The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes, the law; but the maker of the law may commit something to the discretion of the other departments, and the precise boundary of this power is a subject of delicate and difficult inquiry, into which a court will not unnecessarily enter. The principle is repeatedly recognized by all courts that the legislature may authorize others to do things which it might properly, but can not conveniently or advantageously, do itself." See *People* v. *Harper*, 91 Ill. 357.

A similar discussion arose in *People* v. *Reynolds*, 5 Gilm. 1. The statute in that case provided for the division of Gallatin county, and the organization of Saline county out of a portion of it. It however authorized the people of the county proposed to be divided to vote upon the question of division at an election, and provided that the act should go into effect only in case the majority of the voters at such election should vote in favor of division. It was objected that this was a delega-

tion of legislative power to the voters of the county and therefore invalid. In overruling this objection, the court said: "If the saying is true that the Legislature can not delegate its powers, it is only so in its most general sense. We may well admit that the Legislature can not delegate its general legislative authority; still it may authorize many things to be done by others which it might properly do itself. All power possessed by the Legislature is delegated to it by the people, and yet few will be found to insist, that whatever the Legislature may do, it shall do, or else it shall go undone. To establish such a principle in a large State would be almost to destroy all government. * * * We see then, that while the Legislature may not divest itself of its proper functions, or delegate its general legislative authority, it may still authorize others to do those things which it might properly, yet can not understandingly or advantageously do itself. Without this power legislation would become oppressive, and yet imbecile. Local laws almost universally call into action, to a greater or less extent, the agency and discretion, either of the people or individuals, to accomplish in detail what is authorized or required in general terms. The object to be accomplished, or the thing permitted, may be specified, and the rest left to the agency of others, with better opportunities for accomplishing the object, or doing the thing understandingly. In this way have the seats of justice of most of the counties in the State been located." As bearing upon the same general subject, reference may be had to *Kamarath* v. *City of Albany*, 127 N. Y. 575; *Hoyt* v. *Thompson's Executor*, 19 id. 207.; *Hitchcock* v. *Galveston*, 96 U. S. 341.

The legislation of this State abounds with instances where powers similar to the one involved in the present case have been delegated by the Legislature to commissions. In that way, as was intimated in the case of *People* v. *Reynolds*, *supra*, the county seats of most of the counties in the State have been located. The same is true in relation to the location of many

of our State charitable institutions. Thus, the act establishing the Northern Hospital for the Insane, provided for the appointment by the Governor, with the advice and consent of the Senate, of nine commissioners, and authorized them to select a proper location for the proposed hospital, and such commission subsequently located the Hospital at Elgin. Laws of 1869, page 24. In the same way the Southern Illinois Hospital for the Insane was located at Anna. Laws of 1869, page 19. Also the Home for Children of Deceased Soldiers at Normal. Laws of 1865, page 76. Also the Southern Illinois Normal University at Carbondale. Laws of 1869, page 34. Also the Southern Illinois Penitentiary at Chester. Laws of 1877, page 30. Also the Soldiers' and Sailors' Home at Quincy. Laws of 1885, page 16. In these and in many other similar cases to be found in the legislative history of the State, powers of this character have been delegated to and exercised by commissions, boards and similar agencies, and the validity of such delegation has never been questioned. Indeed, to question it successfully, would invalidate a large part of what has been done in the past history of the State by way of perfecting its political, economic, social and charitable organization.

In view of all these precedents, drawn from legislative action as well as judicial decision, it is impossible to hold, that the power to select the place for the next meeting of the General Conference was incapable of delegation. It belonged to that class of powers which legislative bodies have always been free to delegate to commissions or executive boards, whenever their exercise involved arrangements, investigations or details which could be more conveniently or advantageously made or attended to in that way. It follows that the delegation of this power to the Board of Publication must be held to have been valid and effectual, and that the General Conference held in October, 1881, at Indianapolis, the place appointed by the

Board, was the true and lawful General Conference of the Evangelical Association.

This conclusion substantially disposes of the case. The body which convened at Indianapolis being the true and lawful General Conference, its decisions as to all ecclesiastical matters must be accepted as final and conclusive. The proceedings against Bishops Esher and Bowman having been held to be wholly without warrant or authority, and absolutely void *ab initio*, that conclusion must be adopted as the true one, and it follows that the pretended judgments of suspension pronounced against them were never of any validity, and at no time incapacitated them from performing their appropriate functions as Bishops, or from presiding at the various Annual Conferences at which they presented themselves and sought to exercise their prerogatives as presiding officers of those bodies.

The Indianapolis Conference having decided it to be the law of the Association that a Bishop, if present, is "a necessary constituent element of every Annual Conference," and not only entitled to but bound by duty to participate in its proceedings as its presiding officer, and having held, as a necessary consequence, that the Annual Conferences in the divided districts presided over by either Bishop Esher or Bishop Bowman were the true and lawful Annual Conferences in those districts, that decision is conclusive upon the courts, and we must therefore hold that the Annual Conference by which complainant Husser was appointed pastor of the congregation in question in this case was the true and lawful Illinois Annual Conference, and that Husser was the only lawful appointee as pastor of that congregation. Such being the case, no reason is apparent why the decree awarding him that office and protecting him in its enjoyment should not be sustained.

The point is made by counsel for the defendants that, even if Husser is the lawful pastor, neither he nor his co-complain-

ants have established any property rights which entitle them  to the interposition of a court of chancery. The co-complainants are or claim to be members of the congregation, who, during these controversies, have adhered to Husser as their pastor, and they complain that they have been deprived of their right to worship, with their pastor, in the church edifice belonging to the congregation. The objection made to the case presented by them is, that they have been expelled from membership in the congregation, and therefore have no further rights or interest in the church property. It is not disputed that they were formerly members of the congregation, and if they have been expelled, the burden of showing that fact is of course upon the defendants. In the answer, which, by stipulation, was read as a deposition, it is alleged, in substance, that after the difficulties in question arose, they withdrew themselves from the meetings of the congregation, and held religious services in another place, and contributed nothing towards the pastor's salary or other expenses of the church, and that, on that account, the Quarterly Conference of the church expelled them from membership. The Discipline contains an elaborate code of rules applicable to cases where members are sought to be subjected to trial for offenses. Among other things, the charges, if practicable are to be in writing, and the accused and accuser are to be brought face to face, and the trial is to take place before a committee who, if it is at all avoidable, are not to be members of the Quarterly Conference. The Quarterly Conference, as such, has no jurisdiction, unless one of the parties, being dissatisfied with the result of the trial, appeals to that body, and in case of such appeal, a second trial is awarded. There is no pretense that any proceedings were instituted against these members in the forms prescribed by the Discipline, or that any jurisdiction was vested in the Quarterly Conference in the only way possible, viz., by appeal. In fact, there is an entire absence of any showing of disciplinary measures instituted or carried on.

under the rules of the Association, or that the body which is alleged to have expelled them had any authority in the premises. We think there is a substantial failure to show that the complainants had lost their membership.

It is true that as to Husser himself, there was no contract providing for any fixed or definite salary as pastor, but the Discipline clearly contemplates the payment by each congregation to its pastor of an adequate support, and suitable officers and agencies are provided to obtain by voluntary contributions from the members the funds necessary for that purpose. Under these circumstances, it does not seem essential that there should be an express contract for a fixed salary. An adequate salary would appear to be secured by the Discipline, and although it is to be raised, in theory, by voluntary contributions, it is provided that those having ability to pay for the support of the pastor and refusing to do so, shall be "dealt with as other gross transgressors and sinners." We think that, under these circumstances a reasonable compensation is sufficiently secured to create in the incumbent a property right in the office of pastor which a court of equity will recognize and protect.

After giving to the case the patient and careful consideration which its importance seems to demand, we have reached the conclusion that the decree of the Superior Court is warranted by the evidence. The judgment of the Appellate Court affirming the decree will accordingly be affirmed.

*Judgment affirmed.*