The First Presbyterian Church of Lincoln *et al.* Defendants in Error, *vs.* The First Cumberland Presbyterian Church of Lincoln *et al.* Plaintiffs in Error.

*Opinion filed April 21, 1910.*

1. Churches—*civil courts have jurisdiction of church controversy if property rights are involved.* Civil courts have jurisdiction over a controversy between two church corporations where the result of the decision is that one corporation will gain and the other lose a freehold interest in land, and in such case the Supreme Court has direct appellate jurisdiction to review the judgment or decree.

2. Same—*extent to which civil courts are bound by adjudication of supreme judicatory of church.* In a controversy, over property, between churches which are merely subordinate members of an organization having a supreme ecclesiastical tribunal with general control over such churches and their property, which is not held under any special trusts or restrictions imposed by the deed or devise under which it was acquired, civil courts are bound by the decision of such supreme judicatory as to which church is the true one and entitled to hold the property.

3. Same—*when rule that civil courts are bound by decisions of ecclesiastical bodies does not apply.* The rule that civil courts, in deciding property rights in controversies between churches, are bound by the decisions of ecclesiastical bodies on matters of faith, doctrine and other affairs within their legitimate sphere, does not apply where the property is held under some specific trust imposed by deed or will, or where the property is held by a religious corporation which is independent of other ecclesiastical associations and owes no obligation to any higher authority.

4. Same—*when property is not conveyed under a specific trust.* Property conveyed by deed to the named trustees of a specified church, without any other trust of any character being impressed upon it, is not subject to such a specific trust as takes it out of the rule that civil courts, in deciding the ownership of the property as between factions, must be governed by the decisions of the supreme judicatory of the church which bear upon the question.

5. Same—*decision of general assemblies of Presbyterian church and Cumberland church is binding.* The decisions of the general assemblies of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church that there were

no such fundamental differences between the creeds, doctrines and ecclesiastical standards of the churches as would bar a reunion of the two churches are conclusive of such questions, in so far as they bear upon the determination of property rights by civil courts.

6. SAME—*general assembly of Cumberland church had power to authorize reunion.* While there may be no express power in the constitution of the Cumberland Presbyterian Church authorizing its general assembly to direct a reunion with the Presbyterian Church in the United States of America there is no express inhibition against such reunion, and the decision of the general assembly of the Cumberland church that it had such power falls within its jurisdiction and is conclusive on the civil courts.

7. SAME—*decision of general assembly of Cumberland church that a reunion was effected by vote is binding.* The decision of the general assembly of the Cumberland Presbyterian Church that a reunion with the Presbyterian Church in the United States of America had been effected by the vote of the various presbyteries of the church on the proposition for reunion, and that such proposition included a reunion under the name of the Presbyterian Church in the United States of America, is within the jurisdiction of such general assembly and is conclusive upon the civil courts.

8. SAME—*reunion of Cumberland and Presbyterian churches is not invalid.* The plan of reunion between the Cumberland Presbyterian Church and the Presbyterian Church in the United States of America having been adopted and approved by the legally constituted authorities of both churches, and the reunion having been effected in accordance with the laws and usages of both churches in a legal manner, such reunion is not invalid, even though it amounts practically, though not legally, to a merger.

9. SAME—*reunion of Cumberland and Presbyterian churches does not deprive members of constitutional rights.* The reunion of the Cumberland Presbyterian Church and the Presbyterian Church in the United States of America did not deprive members of the Cumberland church of property without due process of law, as such members had no rights in such property as individuals but only as members of a congregation constituting an integral part of the general organization, and their rights in the property as members of the new organization will continue during their membership therein, though the legal title, by virtue of the reunion, is in the new organization.

WRIT OF ERROR to the Circuit Court of Logan county; the Hon. COLOSTIN D. MYERS, Judge, presiding.

W. C. CALDWELL, HUMPHREYS & ANDERSON, BEACH & TRAPP, and BLINN & COVEY, for plaintiffs in error:

The so-called union and merger of the Cumberland Church into the Presbyterian Church is inoperative and void because not authorized by the constitution of the church and in conflict with it.

The decree of a church judicatory is binding only where it is affirmatively shown that it has acted within the scope of its authority and has observed its own organic forms and rules. *Kerr's Appeal,* 89 Pa. 97; *Davis* v. *Congregation,* 40 N. Y. (App. Div.) 424.

The provisions as to the manner of making an amendment to the constitution of a church must be strictly followed in order to accomplish a legal change. *Lamb* v. *Cain,* 14 L. R. A. 528; *Bear* v. *Heasley,* 98 Mich. 279; *State* v. *Foraker,* 46 Ohio St. 677; *Rottman* v. *Barthing,* 22 Neb. 375; *Schlichter* v. *Keiter,* 156 Pa. 119; *State* v. *Swift,* 69 Ind. 505.

Where civil or property rights are sought to be affected by ecclesiastical action it must be made to appear to the civil court that the action in question was within the constitutional power of the particular body, and the burden of showing this is upon those making the assertion. *Ferraria* v. *Vasconcelles,* 31 Ill. 25.

Ecclesiastical decisions are not conclusive when civil rights are involved. Civil courts decide civil rights for themselves. *Landrith* v. *Hudgins,* 120 S. W. Rep. 783; *Ramsey* v. *Hicks,* 87 N. E. Rep. 1091; *Ferraria* v. *Vasconcelles,* 31 Ill. 25; *Happy* v. *Morton,* 33 id. 413; *Chase* v. *Cheney,* 58 id. 537; *Kuns* v. *Robertson,* 154 id. 394; *Fussell* v. *Hail,* 233 id. 77; *People* v. *Order of Foresters,* 162 id. 78; *Ryan* v. *Cudahy,* 157 id. 108; *Hatfield* v. *De-Long,* 156 Ind. 209; *Smith* v. *Pedigo,* 145 id. 361; *Grimes* v. *Harmon,* 35 id. 201; *O'Donovan* v. *Chatard,* 97 id. 423; *Bouldin* v. *Alexander,* 15 Wall. 131; *Perry* v. *Wheeler,* 12 Bush, 541; *Mason* v. *Finch,* 28 Mich. 286; *Krecker*

v. *Shirey*, 163 Pa. 534; *Prickett* v. *Wells*, 24 S. W. Rep.
52; *Pounder* v. *Ash*, 36 Neb. 564.

Civil courts consider doctrine to ascertain the identity
of that church which adheres to the doctrines and tenets of
the denomination or membership of a particular religious
persuasion for whose use the title to the property was held.
*Landrith* v. *Hudgins*, 120 S. W. Rep. 783; *Ferraria* v.
*Vasconcelles*, 23 Ill. 456; 31 id. 54; *Ramsey* v. *Hicks*, 87
N. E. Rep. 1091; *Christian Church* v. *Church of Christ*,
219 Ill. 512; *Smith* v. *Pedigo*, 145 Ind. 361; *Rodgers* v.
*Burnett*, 108 Tenn. 183; *App* v. *Lutheran Congregation*,
6 Pa. 210; *Roshi's Appeal*, 69 id. 462; *Harper* v. *Straws*,
14 B. Mon. 48; *Baker* v. *Fales*, 16 Mass. 488; *Bouldin* v.
*Alexander*, 15 Wall. 131.

Where church property is held in trust for the members
of a particular denomination and a part secede and join
another church, the property is held by those who adhere to
the tenets and doctrine of the original church. *Ferraria* v.
*Vasconcelles*, 31 Ill. 54; *Dubs* v. *Egli*, 167 id. 519; *Gibson*
v. *Armstrong*, 7 B. Mon. 589; *Christian Church* v. *Church
of Christ*, 219 Ill. 512; *Deaderick* v. *Lampson*, 11 Heisk.
529; *Rodgers* v. *Burnett*, 108 Tenn. 173; *Newman* v.
*Proctor*, 10 Bush, 318; *Brown* v. *Monroe*, 80 Ky. 443;
*Gartin* v. *Penick*, 5 Bush, 112; *Watson* v. *Garvin*, 54 Mo.
343; *Baptist Church* v. *Jones*, 79 Miss. 488; *McBride* v.
*Porter*, 17 Iowa, 207; *Godfrey* v. *Walker*, 42 Ga. 562.

JOHN M. GAUT, and KING & MILLER, for defendants
in error:

The general assembly of the Cumberland Presbyterian
Church being "invested with legislative, judicial and execu-
tive authority," and being "the highest court of this church
and representing in one body all the particular churches
thereof," and having power to decide all questions of doc-
trine and ecclesiastical law, and having decided that "such
agreement now exists between the systems of doctrine con-

tained in the confessions of faith of the two churches as to warrant this union,—a union honoring alike to both," and "that said reunion and union has been constitutionally agreed to" and the basis of the union "constitutionally adopted," such decision is binding upon every member of the church and hence is conclusive of this controversy. *Watson* v. *Jones,* 13 Wall. 675; *State* v. *Farris,* 45 Mo. 183; *Brundage* v. *Deardorf,* 92 Fed. Rep. 214; *Nance* v. *Busby,* 91 Tenn. 303; *Mack* v. *Kime,* 129 Ga. 1; *Fussell* v. *Hail,* 134 Ill. App. 620; *Trustees* v. *Harris,* 73 Conn. 217; *Marbury* v. *Madison,* 1 Cranch, 137; *Luther* v. *Borden,* 7 How. 1; *Georgia* v. *Stanton,* 6 Wall. 50; *Miller* v. *Johnson,* 92 Ky. 597.

If the questions of ecclesiastical law and of doctrine are open for the decision of this court, then the law presumes that every act of a church government or department thereof, like every act of the government of a State or of the United States, is valid, and such presumption continues until the invalidity of the act is clearly shown. *Knox* v. *Lee,* 12 Wall. 531; *Gibson* v. *Armstrong,* 7 B. Mon. 515; *McGinnis* v. *Watson,* 41 Pa. 29.

The Cumberland Presbyterian Church had the inherent, inalienable and inextinguishable right and power, independent of the constitution, to form a union with the Presbyterian Church in the United States of America. *Mack* v. *Kime,* 129 Ga. 1; *McBride* v. *Porter,* 17 Iowa, 204; *McGinnis* v. *Watson,* 41 Pa. 9; *Miller* v. *Johnson,* 92 Ky. 594; *Gibson* v. *Armstrong,* 7 B. Mon. 500; *Brundage* v. *Deardorf,* 92 Fed. Rep. 223; *Smith* v. *Swormstedt,* 16 How. 288; *Lamb* v. *Cain,* 129 Ind. 486.

This inherent, sovereign power, under the Presbyterian form of government, resided in the general assembly and presbyteries,—the judicatories which made the constitution and the creed and have the power to amend or change both. *Brundage* v. *Deardorf,* 92 Fed. Rep. 223; *Gibson* v. *Armstrong,* 7 B. Mon. 510; *Smith* v. *Swormstedt,* 16 How. 288.

The general assembly and presbyteries of the church, acting conjointly, had the power, expressly conferred by the constitution, to take every step involved in the formation of the union, and hence had the express power to form the union. *McBride* v. *Porter,* 17 Iowa, 204; *Fussell* v. *Hail,* 134 Ill. App. 620; *Mack* v. *Kime,* 129 Ga. 1.

The civil courts will follow that construction which the Cumberland Presbyterian Church has practically and contemporaneously given its own constitution throughout its entire history. *Mack* v. *Kime,* 129 Ga. 1; *McGinnis* v. *Watson,* 41 Pa. 9; *Smith* v. *Swormstedt,* 16 How. 288; *Gibson* v. *Armstrong,* 7 B. Mon. 481.

The union having been legally formed, those ministers, officers and members who recognize it constitute the ministers, judicators and congregations of the church, whether they be in the majority or minority, and are entitled to the church property, while those who repudiate the authority of the general assembly and presbyteries exercised in the formation of the union, and repudiate the union itself, are seceders from the church and have abandoned all their rights and privileges as to all of the church property. *Sutter* v. *Reformed Dutch Church,* 42 Pa. 503; *Godfrey* v. *Walker,* 42 Ga. 592; *Gaff* v. *Greer,* 88 Ind. 122; *McGinnis* v. *Watson,* 41 Pa. 9; *McBride* v. *Porter,* 17 Iowa, 204; *Ferraria* v. *Vasconcelles,* 23 Ill. 403; *Presbyterian Church* v. *Wilson,* 14 Bush, 270.

Mr. JUSTICE HAND delivered the opinion of the court:

This was a bill in chancery filed by the First Presbyterian Church of Lincoln, Logan county, Illinois, a religious corporation, and the trustees of said corporation, against the First Cumberland Presbyterian Church of Lincoln, Logan county, Illinois, a religious corporation, and the trustees of the said corporation, in the circuit court of Logan county, for an injunction to restrain the defendant corpo-

ration from maintaining and prosecuting a certain eject-
ment suit theretofore commenced by the said defendant
corporation and then pending in the circuit court of Logan
county, against the complainant corporation, whereby the
First Cumberland Presbyterian Church of Lincoln sought
to recover from the First Presbyterian Church of Lincoln
the possession of certain lots situated in the city of Lin-
coln, upon which were situated a church and parsonage
conceded to be in the possession of the complainant cor-
poration, and praying that the title to said lots and the
buildings situated thereon be decreed to be in the First
Presbyterian Church of Lincoln, and that the First Cum-
berland Presbyterian Church of Lincoln be enjoined from
asserting title thereto, and for general relief. An answer
and replication were filed, and the evidence was taken be-
fore the master and reported to the court, and upon a
hearing a decree was entered by the chancellor enjoining
the maintenance and prosecution of said ejectment suit,
and the title to said lots and the buildings located thereon
was by said decree held to be in the First Presbyterian
Church of Lincoln, and the First Cumberland Presbyterian
Church of Lincoln, and its trustees, were enjoined from
asserting title to said lots and buildings or interfering with
the possession of said lots and buildings by the complain-
ant corporation, and it was further decreed that the de-
fendants pay the cost of suit, to reverse which decree the
defendants have sued out this writ of error.

This suit grows out of a controversy arising from a
reunion (which is sometimes characterized in this record
as "reunion and union,") between the Cumberland Pres-
byterian Church (hereinafter referred to as the Cumber-
land church) and the Presbyterian Church in the United
States of America, (hereinafter referred to as the Pres-
byterian church,) which reunion is claimed by the com-
plainant corporation to have been consummated by the joint
action of the general assemblies of said churches in 1906.

The controversy over the propriety of reunion was carried on with great earnestness by the members of said respective church organizations for a number of years prior to 1906, and the question of the validity of said reunion has been challenged by a large faction of the Cumberland church since that date and in many forms has found its way into the courts of a number of the States.

The complainant corporation and the defendant corporation are local religious corporations organized under the statute of this State and respectively lay claim to church property situated in the city of Lincoln, which property admittedly, prior to the year 1906, belonged to the Cumberland church. The complainant corporation rests its title upon the validity of the reunion between said churches, while defendant corporation rests its title upon the invalidity of such reunion. The membership of the Presbyterian church at present comprises the former members of that church and such former members of the Cumberland church as have recognized the validity of the reunion, and the membership of the Cumberland church is composed of the former members of the Cumberland church who have refused to recognize the validity of said reunion. The members of the Cumberland church who have recognized the reunion as valid are at times designated as "unionists" and those who deny the validity of such reunion are frequently designated as "loyalists," and the determination of the question where the title to said church property now rests will necessarily involve a decision of the question whether the reunion of the Cumberland church with the Presbyterian church, as declared by the general assemblies of the two churches in 1906, was valid and binding upon both churches and the members of the said churches and their church judicatories, or whether said reunion was invalid and void. If the reunion between said churches was valid, then the title to the church property involved in this controversy necessarily passed to and became vested in the

245—6

complainant corporation. On the contrary, if said reunion was invalid, then the title to the property did not pass out of the Cumberland church and the title to the said property remains in the defendant corporation. To determine, therefore, intelligently, the main question here involved, we think it advisable at the outset to state somewhat in detail the causes which led the founders of the Cumberland church to abandon the Presbyterian church; the history and growth of the Cumberland church after its establishment; the reasons which led to a desire for a reunion of the Cumberland church with the Presbyterian church, and the method of procedure by which a reunion of the Cumberland church with the Presbyterian church was sought to be and is claimed by the complainants to have been consummated.

The Presbyterian church, whose religious creed was that of the Westminster confession of faith and catechism, was established in the United States at an early day. In the year 1800 a great revival swept over the country, and as a result thereof in 1804-05 there grew up a controversy between the members of the Presbyterian church in certain localities, especially in the State of Tennessee, over the doctrines of fatality, election and predestination found in the Westminster confession of faith, and Samuel McAdow, Finis Ewing and Samuel King, three devout and zealous men who lived in that State, in consequence of the controversy, in 1810 laid the foundations and established the Cumberland Presbyterian Church in Tennessee. In 1813 the church thus founded had grown until its increased membership justified the establishment of three presbyteries, and a synod was also formed, which formulated and published a "brief statement," which set forth in compact form the four propositions upon which the Cumberland church dissented from the Westminster confession of faith. They were: (1) That there are no eternal reprobates; (2) that Christ died, not for a part, only, but for all

mankind; (3) that all infants dying in infancy are saved
through Christ and the sanctification of the spirit; (4)
that the spirit of God operates on the world, or as co-
extensively as Christ has made atonement, in such a man-
ner as to leave all men inexcusable. In 1829 a general as-
sembly of the Cumberland church was established. In 1883
a constitution of the Cumberland church was promulgated,
and the church thus established, at the time of the meet-
ing of its general assembly in May, 1906, had 17 synods,
114 presbyteries, 1514 ordained ministers, 9614 ordained
elders, 3914 ordained deacons, 2869 congregations, and a
membership of 185,212.

In 1903 the Presbyterian church revised the Westmin-
ster confession of faith in such manner that it is claimed
by complainants the essential differences in church doctrines
which wrought a disruption in the Presbyterian church in
1804-05 and led to the establishment of the Cumberland
church in 1810 were so far eliminated from the church
creed of the Presbyterian church as to bring the church
doctrines of the two churches into substantial harmony and
to remove all causes which might rightfully stand in the
way of an honorable and harmonious reunion of the Cum-
berland church with the Presbyterian church. In 1903 the
general assembly of the Cumberland church at its meet-
ing at Nashville, in the State of Tennessee, appointed a
committee on fraternity and union to confer with like
committees of other Presbyterian bodies in regard to the
desirability and practicability of closer affiliation and or-
ganic union among the members of the Presbyterian fam-
ily in the United States. This committee submitted to the
general assembly of the Cumberland church at its meeting
at Dallas, in the State of Texas, in the year 1904, a joint
report of the committee appointed by the general assembly
of the Cumberland church in 1903 and a like committee
appointed by the general assembly of the Presbyterian
church, favoring a reunion of the Cumberland church and

the Presbyterian church upon the doctrinal basis of the Westminster confession of faith as revised in 1903 and the other doctrines and ecclesiastical standards of the Presbyterian church. The general assembly of the Cumberland church adopted the report of said committee, and provided that the proposition of reunion between the Cumberland church and the Presbyterian church be submitted to the presbyteries of the Cumberland church for adoption or disapproval. The proposition was submitted in accordance with the direction of the general assembly of the Cumberland church, and at the meeting of the general assembly of the Cumberland church at Fresno, State of California, in 1905, a special committee was appointed to canvass the vote and report the result of the action taken by the presbyteries upon said proposition. The committee reported that one hundred and eleven presbyteries had voted upon said proposition; that sixty had approved the proposition of reunion and fifty-one had disapproved the proposition, two not voting and one approving the proposition conditionally. A statement was submitted by the minority of the committee which showed that while the proposition had been carried by a majority of the presbyteries it had not been carried by a majority of the individual votes cast in the several presbyteries. The report of the committee was adopted at the meeting of the general assembly of the Cumberland church at Decatur, Illinois, in 1906, and it was there declared by the general assembly of the Cumberland church that a reunion had been established of the Cumberland church with the Presbyterian church, and the general assembly of the Cumberland church thereupon adjourned *sine die*. Immediately after such adjournment the minority who had opposed reunion and who had protested at every step in the action of the general assembly whereby a reunion was sought to be brought about between the Cumberland church and the Presbyterian church, met in another building in the city of Decatur and organized by

the election of a moderator and stated clerk, and rescinded the action of the general assembly which had adjourned, in so far as they had the power, in approving reunion between the said churches, and declared that the reunion between said Cumberland church and Presbyterian church had not been legally consummated, and after transacting other business said minority adjourned to meet one year later in the State of Tennessee at the place where the Cumberland church had been founded, and said minority, claiming to be the lawfully constituted general assembly of the Cumberland church, have held annual meetings as such since that time, and now claim to represent a church membership of something like one hundred thousand Cumberland Presbyterians who have failed and refused to recognize the validity of said reunion of the Cumberland church with the Presbyterian church.

It is clear, therefore, as appears from this record, that in attempting to effect a reunion of the Cumberland church with the Presbyterian church the membership of the Cumberland church has divided,—that is, the unionists have gone over to the Presbyterian church while the loyalists have refused so to do, but remain, as they claim, as the true exponents of the doctrines of the Cumberland church, and the question to be decided, therefore, is narrowed to this: Does the property of the Cumberland church acquired by that church prior to the year 1906 belong to the Presbyterian church with whom the unionists are now affiliating, or to the loyalists who refuse to reunite with the Presbyterian church?

The men who organized the Cumberland church having been formerly members of the Presbyterian church, the form of government adopted by them in forming the Cumberland church was largely modeled after that of the Presbyterian church, and the church judicatories of the Cumberland church, as of the Presbyterian church, consisted of the "church session," which exercises jurisdic-

tion over a single church; the "presbytery," which exercises jurisdiction over what is common to the ministers, church sessions and churches within a prescribed district; the "synod," which exercises jurisdiction over what belongs in common to three or more presbyteries and their ministers, church sessions and churches; and the "general assembly," which exercises jurisdiction over all such matters as concern the whole church,—the lower courts or judicatories being subject to the revision and control of the higher courts in regular gradation.

The power of the presbytery is defined by section 31 of the constitution of the Cumberland church, as follows:

"31. The presbytery has the power to examine and decide appeals, complaints and references brought before it in an orderly manner; to receive, examine, dismiss and license candidates for the holy ministry; to receive, dismiss, ordain, install, remove and judge ministers; to review the records of the church sessions, redress whatever they may have done contrary to order and take effectual care that they observe the government of the church; to establish the pastoral relation, and to dissolve it at the request of one or both of the parties or where the interests of religion imperatively demand it; to set apart evangelists to their proper work; to require ministers to devote themselves diligently to their sacred calling and to censure and otherwise discipline the delinquent; to see that the injunctions of the higher courts are obeyed; to condemn erroneous opinions which injure the purity or peace of the church; to resolve questions of doctrine and discipline seriously and reasonably proposed; to visit particular churches, to inquire into their conditions and redress the evils that may have arisen in them; to unite or divide churches with the consent of a majority of the members thereof, and, for cause, to dissolve the relations between it and a particular church, which shall thereafter cease to be a constituent of the Cumberland Presbyterian Church and forfeit all rights

as such; to form and receive new churches; to take special oversight of vacant churches; to concert measures for the enlargement of the church within its bounds,—in general, to order whatever pertains to the spiritual welfare of the churches under its care, to appoint representatives to the higher courts, and, finally, to propose to the synod, or to the general assembly, such measures as may be of common advantage to the church at large."

The powers of the general assembly are defined by sections 40, 43 and 60 of the constitution of the Cumberland church, as follows:

"40. The general assembly is the highest court of this church and represents in one body all the particular churches thereof. It bears the title of 'The General Assembly of the Cumberland Presbyterian Church,' and constitutes the bond of union, peace, correspondence and mutual confidence among all its churches and courts.

"43. The general assembly shall have power to receive and decide all appeals, references and complaints regularly brought before it from the inferior courts; to bear testimony against error in doctrine and immorality in practice injuriously affecting the church; to decide in all controversies respecting doctrine and discipline; to give its advice and instruction, in conformity with the government of the church, in all cases submitted to it; to review the records of the synods; to take care that the inferior courts observe the government of the church; to redress whatever they may have done contrary to order; to concert measures for promoting the prosperity and enlargement of the church; to create, divide or dissolve synods; to institute and superintend the agencies necessary in the general work of the church; to appoint ministers to such labors as fall under its jurisdiction; to suppress schismatical contentions and disputations according to the rules provided therefor; to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doc-

trine and order of this church; to authorize synods and presbyteries to exercise similar power in receiving bodies suited to become constituents of those courts and lying within their geographical bounds, respectively; to superintend the affairs of the whole church, to correspond with other churches, and, in general, to recommend measures for the promotion of charity, truth and holiness throughout all the churches under its care.

"60. Upon the recommendation of the general assembly at a stated meeting, by a two-thirds vote of the members thereof voting thereon, the confessions of faith, catechism, constitution and rules of discipline may be amended or changed when a majority of the presbyteries, upon the same being transmitted for their action, shall approve thereof. The other parts of the government,—that is to say, the general regulations, the directory for worship and the rules of order,—may be amended or changed at any meeting of the general assembly by a vote of two-thirds of the entire number of the commissioners enrolled at that meeting, provided such amendment or change shall not conflict, in letter or spirit, with the confession of faith, catechism or constitution."

Sections 25 and 27 of the constitution create the several courts or judicatories, in the following language:

"25. The church session exercises jurisdiction over a single church; the presbytery over what is common to the ministers, church sessions and churches within a prescribed district; the synod over what belongs in common to three or more presbyteries, and their ministers, church sessions and churches; and the general assembly over such matters as concern the whole church; and the jurisdiction of these courts is limited by the express provisions of the constitution. Every court has the right to resolve questions of doctrine and discipline seriously and reasonably proposed, and, in general, to maintain truth and righteousness, condemning erroneous opinions and practices which tend to

the injury of the peace, purity or progress of the church, and, although each court exercises exclusive original jurisdiction over all matters specially belonging to it, the lower courts are subject to the review and control of the higher courts, in regular gradation.

"27. The church session is charged with maintaining the spiritual government of the church, for which purpose it is its duty to inquire into the doctrines and conduct of the church members under its care; to receive members into the church; to admonish, suspend or excommunicate those found delinquent, subject to appeal; to urge upon parents the importance of presenting their children for baptism; to grant letters of dismission, which, when given to parents, should always include the names of their baptized children; to ordain and install ruling elders and deacons when elected and to require those officers to devote themselves to their work; to examine the records of the proceedings of the deacons; to establish and control Sabbath schools and Bible classes, with especial reference to the children of the church; to order collections for pious uses and church purposes; to take the oversight of the singing in the public worship of God; to assemble the people for worship when there is no minister; to concert the best measures for promoting the spiritual interests of the church; to observe and carry out the injunctions of the higher courts, and to appoint representatives to the higher courts, and require, on their return, a report of their diligence."

The question now before this court,—that is, the validity of the reunion of the Cumberland church with the Presbyterian church,—has been before the courts of last resort in the following States: Tennessee, Missouri, Kentucky, Georgia, Texas and California, and the Appellate Court of Indiana. The validity of the reunion has been sustained in *Mack* v. *Kime,* Supreme Court of Georgia; *Brown* v. *Clark,* Supreme Court of Texas; *Permanent*

*Committee of Missions* v. *Pacific Synod,* Supreme Court of California; *Wallace* v. *Hughes,* Court of Appeals of Kentucky; and has been held invalid in *Landrith* v. *Hudgins,* Supreme Court of Tennessee; *Boyles* v. *Roberts,* Supreme Court of Missouri, and *Ramsey* v. *Hicks,* Appellate Court of Indiana. Since the case at bar was argued orally, the Supreme Court of Indiana has reversed the Appellate Court of that State and rendered an opinion which is in accordance with the views expressed in this opinion. In *Fussell* v. *Hail,* 233 Ill. 73, this court held that a court of chancery was without jurisdiction to consider upon its merits the case as then presented, as no civil or property right was involved. The question, therefore, as to the validity of said reunion is an open question in this State. While the cases referred to have not found their way as yet into the official reports, by the courtesy of counsel we have had access to all of the said opinions.

We will now take up in this opinion the several contentions of counsel in what we deem their logical order, and consider and dispose of them in so far as we think it necessary for a proper disposition of the case.

The question which presents itself at the threshold of this case is, had the court below jurisdiction of the cause made by the bill, and if so, how far can it go, in the exercise of its jurisdiction as a court of chancery, in determining the case upon its merits and as an original proposition? In *Fussell* v. *Hail, supra,* it was said (p. 77) : "The civil courts deal only with civil or property rights. They have no jurisdiction of religious or ecclesiastical controversies. * * * The civil courts afford no remedy for any abuse of ecclesiastical authority which does not violate a civil or property right." In the case as made by this bill, was, therefore, a property right involved?

In *Schweiker* v. *Husser,* 146 Ill. 399, Husser filed a bill against Schweiker and others to restrain the defendants from interfering with the complainant in acting as pastor

of a church in the city of Chicago. Husser and Schweiker had been appointed to the pastorate of said church by rival conferences. The point was made that no civil or property right was involved, and that a court of chancery for that reason was without jurisdiction. The court held that a property right was involved; that when a contract existed between a church and its pastor for a fixed and definite salary, even though the discipline of the church provided for the payment of the pastor's salary by voluntary contributions, such contract created a property right in the office of the pastor which a court of equity would recognize and protect, and the court took jurisdiction of the case and entered a decree upon the merits. Here a freehold was involved, and the case comes to this court direct by reason of that fact, and by the decree of the lower court, if affirmed by this court, the complainant corporation will gain and the defendant corporation will lose the legal title to the church property in question. This case, therefore, differs from the case of *Fussell* v. *Hail, supra,* in this: that while here there was a property right involved, there there was not. We think it clear the trial court had jurisdiction of the cause made by the bill in this case, and that the lower court, sitting as a court in chancery, had a right to dispose of the case upon its merits.

It is also important, as a preliminary question, to determine what force and effect it was the duty of the chancellor to give to the judgment of the general assembly of the Cumberland church, sitting as an ecclesiastical court, in its determination that a reunion between the Cumberland church and the Presbyterian church has been consummated, when passing upon the question of title to the real estate claimed by the respective parties to this suit, the question being, when an ecclesiastical court has, according to the constitution and ecclesiastical standards of the church and the canons and rules of the church, determined which faction in a church, in case of a division, is regular and

which is irregular, how far is a court of chancery, in settling a property right, bound by such ecclesiastical adjudication? While it must be admitted that an ecclesiastical court cannot adjudicate upon and determine a. civil or property right, (*Fussell* v. *Hail, supra,*) we think the great weight of authority in this country is to the effect that the civil courts, in adjudicating upon civil and property rights in those classes of church contentions to which this case belongs, are bound by the adjudications of the ecclesiastical court as to which of the contending factions in the church is the true representative of the church and which faction is outside of and beyond the pale of the church, and that the civil courts will decree the title of church property to belong to ·the faction in the church which the ecclesiastical courts have held to be the true representative of the church.

In the case of *Schweiker* v. *Husser, supra,* while the court held a property right was involved and entered a decree upon the merits, it held it was bound by the adjudication of the general conference in so far as it had determined that a judgment of suspension or expulsion of one of the bishops of the church was void and had set such adjudication aside. The court, on page 415, said: "Assuming that, as the Evangelical Association is constituted, there can be but one body lawfully entitled to be recognized as the Illinois Annual Conference, the title of these two claimants to the office of pastor must obviously depend upon the question as to which of these two rival bodies was, in fact, the regular and lawful annual conference of the association. In determining this question recourse must be had to the constitution and laws of the denomination, and especially to the decisions on that subject of the supreme judicial, legislative and administrative authority of the denomination, the general conference. If such decisions can be found, unless they are clearly and manifestly repugnant . to the established laws of the denomination, they are bind-

ing and conclusive upon the civil courts, and must be followed in the determination of such property rights as those courts may be called upon to adjudicate." The cases of *Ferraria* v. *Vasconcelles,* 23 Ill. 456, *Chase* v. *Cheney,* 58 id. 509, and *Kuns* v. *Robertson,* 154 id. 394, are in point and are in entire harmony with the *Schweiker case.*

In *Lamb* v. *Cain,* 129 Ind. 486, (29 N. E. Rep. 13,) an action was brought by one faction of a church of the United Brethren against another faction, to recover the possession of certain real estate and to quiet the title thereto, and to enjoin the opposing faction from exercising any control over the meeting house situated thereon. The court, in disposing of the case, in a well considered opinion said: "The questions which have come before the civil courts concerning the rights to property held by ecclesiastical bodies have been divided into three classes, namely: First, cases where the property which is the subject of controversy has been by deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support or spread of some specific form of religious doctrine or belief; second, to property held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and, so far as church government is concerned, owes no fealty or obligation to any higher authority; third, to cases of property held by a religious congregation or ecclesiastical body which is a subordinate member of some general church organization in which there are superior ecclesiastical tribunals, with general ultimate powers of control, more or less complete, in some supreme judicatory over the whole membership of that general organization." After considering the first and second classes of cases referred to, the court considers the force of an adjudication of an ecclesiastical court as to the third class, (to which class the case at bar belongs,) as follows: "This brings us to

an examination of the rules of law governing the third class, to which it is conceded by all the parties to this controversy the case now under consideration belongs. It may be remarked, at the outset, that the civil courts in this country have no ecclesiastical jurisdiction. There is a complete separation of church and State. Everyone has the legal right to entertain any religious belief, to practice any religious principle and to teach any religious doctrine which does not violate the laws of morality or property and which does not infringe the personal rights of others, which may seem to him right and proper, without any interference from the courts. The law here knows no heresy and is committed to the support of no dogma. It recognizes the right of the people to organize voluntary religious associations to assist in the dissemination of any and all religious doctrines, with the exceptions above named, and to create tribunals for the decision of the controverted questions of faith and for ecclesiastical government of all the individual members, congregations and officers within the general association. All who unite with such associations, when so organized, impliedly consent to submit to such government. From these considerations the rule in this country has become elementary, that when a civil right depends upon some matter pertaining to ecclesiastical affairs the civil tribunal tries the right and nothing more, taking the ecclesiastical decisions out of which the civil right has arisen as it finds them, and accepts such decisions as matters adjudicated by another legally constituted jurisdiction." The court, in the course of its opinion, quoted the following excerpt from the opinion in *White Lick Quarterly Meeting* v. *White Lick Quarterly Meeting,* 89 Ind. 136: "The civil courts act upon the theory that the ecclesiastical courts are the best judges of merely ecclesiastical questions and of all matters which concern the doctrines and discipline of the respective religious denominations to which they belong. When a person becomes a member of a church he

becomes so upon the condition of submission to its ecclesiastical jurisdiction, and, however much he may be dissatisfied with the exercise of that jurisdiction, he has no right to invoke the supervisory power of a civil court so long as none of his civil rights are invaded."

In the case of *Reform Church* v. *Seibert,* 3 Pa. St. 291, it was said by the court: "The decisions of ecclesiastical courts, like every other judicial tribunal, are final, as they are the best judges of what constitutes an offense against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline and doctrine; and civil courts, if they should be so unwise as to attempt to revise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals."

The leading case, perhaps, in this country upon this subject is *Watson* v. *Jones,* 13 Wall. 679, which we think fully sustains the doctrine that the judgment of an ecclesiastical court is binding and conclusive upon the civil courts in so far as it (having jurisdiction of the parties and the subject matter) determines which faction of the church is the true representative of the church, and that where, as here, no specific trust is fastened upon church property by the grantor or donor, and where, as here, the religious corporation or other body holding title to church property is but a subordinate member of some general church organization in which there is a superior ecclesiastical tribunal, with general jurisdiction of review and control over the inferior tribunals of the church and its members, the judgment of such tribunal is, within its legitimate sphere, binding and conclusive upon the civil courts, and that such judgment must be followed by the civil courts in the determination of such property rights as the civil courts may be called upon to adjudicate. The rule thus announced

does not apply (1) to property conveyed to a church where
a specific trust is imposed by deed or will by the party cre-
ating the trust; (2) neither does the rule apply to prop-
erty which is held by a religious congregation which, by
the nature of its organization, is strictly independent of
other ecclesiastical associations, and, so far as church gov-
ernment is concerned, owes no fealty or obligation to any
higher authority.   In speaking of the first exception above
referred to, the learned justice who wrote the *Watson case*
said: "It seems hardly to admit of a rational doubt that
an individual or an association of individuals may dedicate
property by way of trust to the purpose of sustaining,
supporting and propagating definite religious doctrines or
principles, providing that in doing so they violate no law
of morality and give to the instrument by which their pur-
pose is evidenced, the formalities which the laws require;
and it would seem also to be the obvious duty of the court,
in a case properly made, to see that the property so dedi-
cated is not diverted from the trust which is thus attached
to its use.   So long as there are persons qualified within
the meaning of the original dedication and who are also
willing to teach the doctrines or principles prescribed in
the act of dedication, and so long as there is anyone so
interested in the execution of the trust as to have a stand-
ing in court, it must be that they can prevent the diversion
of the property or fund to other and different uses.   This
is the general doctrine of courts of equity as to charities,
and it seems equally applicable to ecclesiastical matters."
And he thus refers to the second exception: "The second
class of cases which we have described has reference to the
case of a church of a strictly congregational or independ-
ent organization, governed solely within itself, either by a
majority of its members or by such other local organism as
it may have instituted for the purpose of ecclesiastical gov-
ernment; and to property held by such a church, either by
way of purchase or donation, with no other specific trust

attached to it in the hands of the church than that it is for the use of that congregation as a religious society." *Christian Church* v. *Church of Christ*, 219 Ill. 503, is an example of this class.

In speaking of the rules which must govern church property which is similarly situated to the property in question, in the *Watson case* it was said: "The third of these classes of cases is the one which is oftenest found in the courts, and which, with reference to the number and difficulty of the questions involved, and to other considerations, is every way the most important. It is the case of property acquired in any of the usual modes for the general use of a religious congregation which is itself part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government. The case before us is one of this class, growing out of a schism which has divided the congregation and its officers and the presbytery and synod and which appeals to the courts to determine the right to the use of the property so acquired. Here is no case of property devoted forever by the instrument which conveyed it, or by any specific declaration of its owner, to the support of any special religious dogmas or any peculiar form of worship, but of property purchased for the use of a religious congregation, and so long as any existing religious congregation can be ascertained to be that congregation, or its regular and legitimate successor, it is entitled to the use of the property. In the case of an independent congregation we have pointed out how this identity or succession is to be ascertained, but in cases of this character we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control and is bound by its orders and judgments. There are in the Presbyterian system of ecclesiastical government, in regular succession, the presby-

245—7

tery over the session or local church, the synod over the presbytery, and the general assembly over all. These are called, in the language of the church organs, 'judicatories,' and they entertain appeals from the decisions of those below and prescribe corrective measures in other cases."

In this case the property was in each instance conveyed to the trustees (naming them) of the First Cumberland Presbyterian Church of Lincoln, and no trust of any character was impressed upon the property conveyed, except as one would be implied from the fact that the property was conveyed. These conveyances clearly fall far short of creating a specific trust within the first exception hereinabove referred to, but fall within the third class spoken of in the opinion in *Watson* v. *Jones, supra.* The *Watson case* has been referred to with approval by this court, (*Christian Church* v. *Church of Christ, supra,*) and the doctrine announced therein is approved by the several State courts which have sustained the reunion of the Cumberland church with the Presbyterian church, while its doctrine upon the subject in hand is repudiated by the State courts which have held the reunion invalid. We have reached the conclusion that full faith and credit must be given to the adjudication of the general assembly of the Cumberland church so far as that assembly, sitting as an ecclesiastical court, adjudicated upon ecclesiastical questions, the determination of which is involved in the decision of this case.

It is urged by counsel for the plaintiffs in error that the differences between the creeds and church doctrines of the Cumberland church and the Presbyterian church are so fundamental that there can be no reunion between the two churches, and they have set out in their brief, in parallel columns, extracts from the respective creeds of the two churches, and we are asked to compare and interpret the creeds of the two churches and to determine that such creeds are so far out of harmony with each other that no reunion can be formed between said churches. The deci-

sion of the questions thus raised involves a determination of the meaning of the Westminster confession of faith and catechism and the effect thereon of the revision of 1903; also a consideration of the confession of faith of the Cumberland church, which involves a weighing and comparing of the two creeds. The questions thus raised are essentially ecclesiastical and were obviously proper questions for the determination of the general assemblies of the Cumberland church and the Presbyterian church, and the highest judicatories of the two churches having passed upon those questions and held that there were no such fundamental differences, at the time of the proposed reunion, existing between the creeds, church doctrines and ecclesiastical standards of the two churches as to bar a reunion of the two churches, we are of the opinion this court is foreclosed by the decisions of those general assemblies upon the questions thus decided, whether the decisions of the said ecclesiastical courts were right or wrong. In the *Watson case* the court said: "In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and State under our system of laws and supported by a preponderating weight of judicial authority, is, that whenever the questions of discipline or of faith or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final and as binding on them in their application to the case before them. * * * Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal and the Presbyterian churches,) has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of prece-

dents, in their usage and customs, which, as to each, constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so."

It is also urged that there is no constitutional power, either express or implied, to be found in the organic law of the Cumberland church which authorized the Cumberland church to reunite with the Presbyterian church. The decision of this question rests upon the construction of the constitution of the Cumberland church of 1883, the ecclesiastical standards and doctrines of that church and the history of the church from its organization. We think the question thus raised falls (as we have held the question of the interpretation of the creed of that church does) within the jurisdiction of the highest court of the Cumberland church, namely, its general assembly, and that the decision of the general assembly of the Cumberland church upon the question of reunion was binding upon the trial court and is binding upon this court. If, however, the question is treated as an open one in this court, we are of the opinion the same conclusion as to the right of reunion must be reached by this court that was reached by the general assembly. From an examination of the constitution of the Cumberland church, while there may be found therein no express power authorizing a reunion, there will be found therein no express inhibition against reunion. It has been determined by the general assembly of the Cumberland church that a reunion between the Cumberland church and the Presbyterian church will tend to advance the growth and prosperity of the Cumberland church, and there appears to have been a desire for a reunion evidenced by the

membership of the Cumberland church with the Presby-
terian church all through the history of the Cumberland
church.   The general assembly of the Cumberland church
clearly had the power to employ all means which would ad-
vance the interests of that church, as in that body is found
vested the sovereign power of the Cumberland church,—
that is, the supreme administrative, legislative and judicial
power of the church, except in so far as the exercise of
supreme power, if at all, has been limited by express con-
stitutional enactment; and as there is no express constitu-
tional limitation upon the subject of reunion, the right of
reunion, we think, must be held to exist,—and such is the
conclusion generally reached by the courts which have con-
sidered the question of reunion.

In *Fussell* v. *Hail,* 134 Ill. App. 620, the right of re-
union between the Cumberland church and the Presbyterian
church was considered by the court, and the statement and
reasoning of the learned judge who wrote the opinion in
that case is so clear and convincing as to the existence of
the right of reunion between the Cumberland church and
the Presbyterian church that we here insert an excerpt
from that opinion, (p. 630,) which very clearly expresses
our own view upon the subject:

"In the case at bar the general assembly of the Cum-
berland Presbyterian Church in effect determined that the
confession of faith of the Presbyterian Church of the
United States of America, as modified by the declaratory
statement of 1903, was so far like that of the Cumber-
land Presbyterian Church that it was the duty of the two
churches to reunite; that the two churches were of substan-
tially similar faith.   Under the authorities we are bound
by the decisions of the general assembly of the Cumberland
Presbyterian Church,—the highest court in that church,—
to the effect that there is such an agreement between the
systems of doctrine contained or stated in the confessions
of faith of the two churches since the declaratory state-

ment of 1903 as to warrant the union proposed. Appellants contend, however, that even if the general assembly had power to determine all matters of doctrine of faith, yet its action looking toward such a reunion was wholly unconstitutional, *ultra vires* and void. Appellees argue that the action taken was fully warranted by the constitution, and further contend that the general assembly had inherent as well as the constitutional right to consummate the union. Upon the case as presented by the bill we hold that the general assembly had authority to provide for and establish a union (or reunion, as it is often called in the bill and arguments,) of the Cumberland Presbyterian Church with the Presbyterian Church of the United States of America. Section 40 of the constitution of the Cumberland Presbyterian Church makes its general assembly the highest court in the church, and section 43 of such constitution gives such assembly power to concert measures for promoting the prosperity and enlargement of the church, to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine of the Cumberland Presbyterian Church, and to superintend the affairs of the whole church, as well as power to decide all controversies respecting doctrine. The effect of such sections is to make the general assembly not only a legislative and administrative body, but one with judicial powers upon ecclesiastical questions as well. It represents in one body all the particular churches in the Cumberland Presbyterian Church organization and constitutes one bond of union. Why is it not possible to promote the prosperity and enlargement of the church by uniting with another body that teaches a doctrine or faith identical with its own? If these two churches, in their confessions of faith and their religious teachings, are the same, then these interests may be promoted by uniting all those who preach, teach and believe in and care for those interests, the same as can be done by individuals joining their interests in co-partner-

ships or corporations. United action is productive of more good than divided action, under the circumstances. The general assembly has power to receive under its jurisdiction other ecclesiastical bodies of the same faith. This clause must be read with the clause that directs the taking of measures to promote and enlarge the church, and in our judgment the church is enlarged and its prosperity made more sure by receiving the support of a stronger sister church. If a smaller church can be received, surely affiliation and union can be made with a stronger sister church, if thereby the church, as a religious body, is prospered and enlarged."

The Supreme Court of Texas, in discussing the right of reunion, finds in the constitution of the Cumberland church ample power, as incident to the express powers conferred upon the general assembly of the Cumberland church, to authorize a reunion of the Cumberland church with the Presbyterian church and to take the necessary steps to consummate such reunion. It says: "It is claimed that the ecclesiastical courts, by the constitution of the Cumberland church, had no powers except such as are expressly given in the constitution. The assertion is based upon the following language in section 25 of that instrument: 'And the jurisdiction of these courts is limited by the express provisions of the constitution.' No provision is made in the constitution for the individual members of the congregations to participate in the government of the church, except that the members of each local church may select the ruling elders of that congregation. Four courts were created by the constitution to which all authority of the church was confided, and section 25 of that constitution distributed the powers of the church among the four courts, defining the sphere within which each court could exercise the power committed to it. The language quoted above and relied upon by the defendants in error is found in section 25 of the constitution, being the last clause of

the sentence which defines the jurisdiction of the several courts. One effect of that language was to distinctly mark the boundaries of the jurisdiction of each court, so as to prevent the encroachment of one upon the jurisdiction given to another. For example, the church session is given authority over matters which belong to one church, and to this it is limited. It had no power to deal with that which belongs to the whole church. The general assembly was given jurisdiction over all matters which concerned the whole church,—that is, all of its members and churches. The original jurisdiction of the general assembly is limited by the language in question to those things which belong to the churches in general, and it could not exercise authority over any matter which concerned only one church, except upon appeal. The sphere of action and subjects allotted to each is limited by the express terms of section 25. While the language has the effect to place the limitation stated upon the different courts, it is not correct to say that it had no other effect, for we are of opinion that each court must find in the constitution some express authority given for the performance of any act by it. But it would be a strained and unnatural construction to hold that by this language the court must find an express provision which definitely authorizes each act done in the exercise of its powers,—that is, that it should have the effect to exclude all implied authority and all inherent power that resides in a court by reason of its organization and the duties imposed upon it. It is elementary that the grant of specific power or the imposition of a definite duty upon any person or court confers, by implication, the authority to do whatever may be necessary in order to execute the power conferred or to perform the duty imposed, and the implied power is as much a part of the statute as if it were written into the body of the act itself. (Sutherland on Stat. Const. sec. 334.) If, therefore, there was any duty imposed upon the general assembly or if there was any au-

thority given to it by the constitution which required or
authorized the union of the two churches, then the au-
thority was conferred by the express provision which im-
posed the duty or conferred the authority from which the
implication arises. As before stated, all of the authority
and power of the membership of the church was confided
to the different judicatories that were created by the con-
stitution. To the general assembly was committed the
supreme legislative, judicial and executive power of the
church. It was declared to be the highest court of the
church, and was authorized to pass all necessary laws, rules
and regulations for the whole church. Indeed, it was em-
powered to alter the articles of faith of the church. The
general assembly had authority to adjudicate and deter-
mine all matters which concern the whole church, and was
the court of last resort, with appellate jurisdiction over
all others. It had the authority to dissolve any one of the
other judicatories in order to enforce the discipline of the
church. It was declared by the constitution that the gen-
eral assembly represents 'in one body all the particular
churches thereof;' and again, it is said that it constitutes
'the bond of union, peace, correspondence and mutual con-
fidence among all its churches and courts.' In the general
assembly all of the churches are united, as it is said it is
the bond of union and it is the means by which the peace
of the congregations is preserved and the mutual confidence
is cultivated and encouraged. It would be difficult to make
a more ample expression of authority conferred and duty
imposed than is found in the language used in this con-
stitution. We conclude that the general assembly of the
Cumberland church was the embodiment and expression of
the sovereign power of the whole church and its member-
ship, and that it could do for the churches and for the
membership whatever they could have done if they had
been assembled for that purpose. The general assembly of
the Cumberland church had authority to determine, from

the provisions of the constitution, whether it had the power to enter into the union with the Presbyterian church, and having decided that it had such authority, and having acted upon that decision, the civil courts have no power to review that action."

The right of reunion between the Cumberland church and the Presbyterian church is also elaborately discussed by Mr. Justice Neil in *Landrith* v. *Hudgins, supra,* and while upon other grounds he holds the reunion between the two churches invalid, he held the right of reunion to exist. He said: "Numerous efforts have been made in comparatively recent years by various branches of the Protestant division of the church for union among themselves. Many of these efforts have been made by organizations holding the Presbyterian system. * * * In support of this statement we cite the following proposed unions, viz.: Cumberland presbytery with the synod of Kentucky in 1810; Cumberland presbytery with the West Tennessee presbytery and Muhlenberg presbytery in 1811; a resolution expressing a desire for a union of the whole Presbyterian family, adopted in 1860; the Cumberland Presbyterian Church with the Presbyterian Church (South) in 1867; the Cumberland Presbyterian Church with the Presbyterian Church (North) in 1873; the Cumberland Presbyterian Church with the general synod of the Evangelical Lutheran Church in the United States in 1882; and the Cumberland Presbyterian Church with the general conference of the Methodist Protestant Church in 1885. These facts, and numerous instances of other unions in other church societies, either effected or attempted, clearly indicate that denominational differences were not intended to be necessarily unending and that independent organizations were not essentially designed for perpetuity. In christian thought, unity is more desirable than division. All denominational church organizations have as their primary object the propagation of the christian religion. The individual advance-

ment of each separate organization is looked upon as a contribution, that far, to the general cause. A union with another church organization having the same purpose may be regarded, therefore, as a step forward in the consummation of the work in which all are engaged. * * * From what has been previously said * * * we are enabled to understand the thought in the minds of the members of the Cumberland Presbyterian Church from the beginning until now, exhibited in the efforts for union made through so many years. We are enabled to understand why the overtures for union made through so many years by the general assembly of that church have not shocked its membership as a thing foreign to its purposes; why, in fact, it has always been considered a policy in harmony with the general purpose of its organization and work. The fact that these unions were not consummated because the negotiating parties could not agree upon terms is immaterial. The point is, that these propositions and negotiations show that the church bodies making or entertaining them did not consider that they were intended to be or ought to be perpetual, but, on the contrary, that divisions ought to be healed. The pregnant and undeniable fact is that such negotiations indicate a belief in the possibility of union. For the purposes of this particular phase of the inquiry it is immaterial what propositions composed the terms offered or rejected or accepted, as the case may be. The fact that the matter of union was so often brought up and considered, or that it was considered at all, is proof positive that those who had authority to speak for the Cumberland Presbyterian Church, and who uttered its .voice, believed that the power to effect union existed; and the fact that it has been brought forward and considered at intervals from the founding of the church to the present time, proves that this belief has long existed,—has lived in the thought of the Cumberland people along with the life of the organization. This belief was based either upon some power ex-

pressed in the standards of the church, or upon an implied power supposed to exist in the organization. The power exists by implication. It exists from the very nature of the case, not only in the Cumberland organization, but in every other christian society in whose standards there is not an explicit pronouncement to the contrary, because they are all parts of one whole, all engaged in the same work, seeking the same end and animated by a common purpose."

The contention is also made that the reunion between the Cumberland church and the Presbyterian church was invalid because the question submitted to the presbyteries of the Cumberland church and affirmatively answered by a majority of the presbyteries did not include the proposition stated in the first paragraph of the basis of union,— that is, that the reunion should take place upon the basis that the two churches shall be "united as one church, under the name and style of 'The Presbyterian Church in the United States of America,' possessing all the legal and corporate rights and powers which the separate churches now possess;"—in other words, that the name "Cumberland" was surrendered by the general assembly of the Cumberland church to the Presbyterian church without the proposition of the surrender of the church name having been submitted to the presbyteries.

The material parts of the plan of reunion were the following: "That the reunion of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church be accomplished as soon as the necessary steps can be taken, upon the basis hereinafter set forth.

"I. The Presbyterian Church of the United States of America, whose general assembly met in the Immanuel Church, Los Angeles, California, May 21, 1903, and the Cumberland Presbyterian Church, whose general assembly met in the First Cumberland Presbyterian Church, Nashville, Tennessee, May 21, 1903, shall be united as one church, under the name and style of 'The Presbyterian

Church in the United States of America,' possessing all the legal and corporate rights and powers which the separate churches now possess.

"2. The union shall be effected on the doctrinal basis of the confession of faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice.

"3. Each of the assemblies shall submit the foregoing basis of union to its presbyteries, which shall be required to meet on or before April 30, 1905, to express their approval or disapproval of the same by a categorical answer to this question: 'Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church on the following basis: The union shall be effected on the doctrinal basis of the confession of faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice?' Each presbytery shall, before the tenth day of May, 1905, forward to the stated clerk of the assembly with which it is connected, a statement of its vote on the said basis of union.

"4. The report of the vote of the presbyteries shall be submitted by the respective stated clerks to the general assemblies meeting in 1905, and if the general assemblies shall then find and declare that the foregoing basis of union has been approved by the constitutional majority of the presbyteries connected with each branch of the church, then the same shall be of binding force and both assemblies shall take action accordingly."

We are impressed with the view that the general assembly of the Cumberland church had the right to determine for itself the question whether the plan formulated by the general assemblies of the two churches for reunion, including a proper submission of all the questions which it was necessary to submit to the presbyteries of the two churches in order to confer upon the general assembly of the Cumberland church jurisdiction over the question of reunion between the Cumberland church and the Presbyterian church, had been agreed upon, and that in declaring the union between said churches had been established said general assembly necessarily passed upon and determined the question of the jurisdiction of that general assembly to act, and that the general assembly of the Cumberland church having held that it had jurisdiction to declare a reunion between those churches had been established, the question of the jurisdiction of the general assembly of the Cumberland church over the question of reunion has been conclusively settled, and that the trial court was, and this court is, bound by the determination of that question as it was settled by the general assembly of the Cumberland church.

In *Schweiker* v. *Husser, supra,* the question arose whether the general conference of the Evangelical Association of North America had the power, after it had fixed the date upon which its next general conference was to be held, to delegate to its board of publication the power to select the place at which the general conference should be held. The board of publication, in pursuance of such delegated power, fixed the place at which the general conference was to meet, which action was approved by the general conference. This court, on page 425 of the opinion, said: "In determining whether the matter of appointing the place for the meeting of the next general conference was one which could be thus delegated to the board of publication, great deference is due to the decision of the conference

itself, to be implied from the very act of making the delegation, that the matter could be properly committed to such board.   Being the supreme legislative and administrative as well as judicial body, it had the power and it became its duty, in each instance, to determine its own authority to act, and its conclusions in relation thereto are entitled to great weight, if they are not, indeed, conclusive upon the civil courts.   Unless, then, they were manifestly violative of the constitution or laws of the association or in clear and palpable excess of its own jurisdiction they are not subject to review by courts of equity, and must be held to be in accordance with the true exposition of the rules established for the regulation and government of its action."

In *Mack* v. *Kime, supra,* the Supreme Court of Georgia said: "When a controversy involving the rights of a member is presented to the civil courts, they will examine into the constitution and laws of the religious society to determine whether a tribunal has been erected for the decision of ecclesiastical questions, and they will also examine into the laws of the association to determine whether the decision by the tribunal was concerning a matter which was within its jurisdiction.   If its jurisdiction depends upon the construction of its own laws, and such laws have, either expressly or impliedly, conferred upon it the right to determine the limits of its jurisdiction, the decision of the church tribunal as to its jurisdiction will be no less binding than its decision on the merits of the ecclesiastical question determined by it."

The precise question here raised was disposed of adversely to the contention of plaintiffs in error by the Supreme Court of California in *Permanent Committee of Missions* v. *Pacific Synod, supra.*   That court said: "The first ground, specifically, is that the question proposed to the presbyteries and affirmatively answered did not include the proposition stated in the first paragraph of the basis of

union, that the united church should have the name and style of 'The Presbyterian Church in the United States of America;' that the presbyteries have never expressly approved of the proposal so far as it involved the elimination of the word 'Cumberland' from the church name, and hence that the attempt to unite was abortive. In this connection we will also notice the objection that neither the assembly alone, nor the assembly and presbyteries together, had the power to change the name of the church. We do not find anywhere in the Cumberland Presbyterian constitution a declaration that the name of the church shall be the 'Cumberland Presbyterian Church.' The history of that church does not show that by any action of the membership, or of the general assembly and presbyteries jointly, that name was adopted as the name of the church. The first presbytery, which was organized in 1810, adopted the name 'Cumberland Presbytery.' In the subsequent meetings of the church courts, and in the church literature, the church was always designated as the Cumberland Presbyterian Church. The constitution of 1883 describes the church by that name, and further declares that the general assembly bears the title of 'The General Assembly of the Cumberland Presbyterian Church.' In the year 1850 a change of name was suggested in the general assembly, but it did not meet with favor and the proposition was dropped without action. There is nothing in the evidence to show that the church, either by general assembly action or by that body and the presbyteries combined, has ever expressly declared what its name should be. It evidently received its name originally, by common consent, from the fact that its first presbytery took the distinctive name 'Cumberland' because it was located in the Cumberland region of Tennessee. The name, therefore, is not shown to be an essential part of the church structure. It constitutes no part of the church government. A change of name would seem to be within the province of the general assembly, acting alone.

It has general jurisdiction 'over such matters as concerned the whole church.' It was expressly authorized 'to concert measures for promoting the prosperity and enlargement of the church and to superintend the affairs of the whole church.' It is made the supreme authority of the church, except as 'limited by the express provisions of the constitution.' The provision that the assembly, with the approval of the presbyteries, may change or amend the confession of faith, the catechism, the constitution and the rules of discipline, is perhaps a limitation upon the power of the assembly, alone, to make such changes or amendments, but this provision does not include the change of the church name. Nor is the name a part of the general regulations, directory for worship or rules of order, which, by the second paragraph of the provision concerning amendments, can be amended or changed only by a two-thirds vote of all the enrolled members of the assembly. As observed in *McBride* v. *Porter,* 17 Iowa, 204: 'It is the substance, and not the name, that the law regards.' Not being expressly fixed by the constitution, the church name is not an essential part of it. The obvious conclusion is that it is within the power of the assembly to change the name, and there was no necessity for the approval thereof by the presbyteries. In confirmation of this conclusion we have the decision of the general assembly itself. Its formal declaration that the entire plan of union had been constitutionally adopted could be true with respect to the change of name only upon the theory that the question put to and affirmed by the presbyteries included an approval of the proposed change of name or upon the theory that presbyterial approval thereof was not necessary. The declaration was therefore equivalent to a decision that one of these two theories was correct. This being a matter solely of ecclesiastical jurisprudence, the decision of the assembly, the highest authority of the church, is, as we will hereinafter show, conclusive upon all civil courts. Moreover, the terms

245—8

of the question, if the appellant's counsel are correct in their estimate of the importance of the name, imply the change proposed. The Cumberland church was formed by members of the Presbyterian church. The question proposed the 'reunion and union' of the two churches, obviously meaning the reunion which had been proposed in the basis of union, including the change of name. It stated that the change was to be made upon the 'ecclesiastical standards' of the Presbyterian church. If the name was so all-important as the appellant insists that it was,—so important that its omission would have been fatal to the union,—then its name must have constituted one of the standards of the Presbyterian church, and a reunion under those standards would have been a reunion under its name."

It is also insisted that the plan of reunion between the Cumberland church and the Presbyterian church provided for the merger of the Cumberland church and its membership into the Presbyterian church, and that by the consummation of such plan the identity of the Cumberland church would be lost and its name surrendered and its membership and property transferred to and incorporated into the Presbyterian church. If such is the effect of the proposed plan of reunion, we are unable to discover any such legal objection thereto (it having been adopted and approved by the lawfully constituted authorities of both churches) as would authorize a court of chancery to hold the plan of reunion *ultra vires* and void and justify such court in setting the reunion aside after it had been consummated. The founders of the Cumberland church had been members of the Presbyterian church, and if the grounds of difference between the two churches have been removed and the members of the Cumberland church, in a constitutional manner, have determined to return to and reunite with the parent church, and have agreed upon a plan of reunion which involved the absorption of the Cumberland church or worked a merger of the name and its membership and property

into the parent church, and such merger was desired by the entire membership of the Cumberland church, we know of no one who could complain, and if the merger has been effected in accordance with the law and usages of both churches, and in a legal manner, we think no one can complain. It certainly would involve all church organizations in a peculiar situation if it were held no merger of one church could take place with another. We do not, however, understand from this record that there is to be a complete merger of the Cumberland church into the Presbyterian church. In the California case heretofore referred to, the court, in considering this question of merger, said: "The conclusion which we have reached on this branch of the case (that is, that the power of reunion existed,) makes immaterial the objection that the result of the action of the church, if effectual, would not be a mere union of the two societies, but would be a merger into the Presbyterian church or an absorption of the former by the latter, which, it is said, is equivalent to a complete destruction or annihilation of the former. Granting that such would be the technical effect of the proceedings, the power to change and amend is unlimited, and it was within the power of the assembly and presbyteries to carry it to that extent. But as it may be of some importance in construing the judgment in this case, we deem it necessary to say that in our opinion no such consequences ensue. Each particular church, each presbytery and each synod established by the Cumberland church, retains its individual and separate integrity and existence and its property rights, after the union as fully as before, until and unless some change is made by the regular authorities of the united church having power to make it. The main difference in their condition resulting from the union is, that they now belong to a larger body and have relatively less influence and power in affairs affecting the whole church. The entire church continues to exist, not separately and distinctively, indeed,

but in union and association with the other church. The same is true of the Presbyterian church. The united church exists in continuity with and as the successor of both of the former churches. Neither of them has now a separate existence, one no more than the other."

The Court of Appeals of Kentucky, in *Wallace* v. *Hughes, supra,* in considering the question of merger, said: "It will thus be seen that the Cumberland Presbyterian Church, from its very beginning, has ardently desired a reunion with the mother church and has sought on several occasions a union with churches other than the Presbyterian. The men who founded this church, and those who, from time to time, have constituted its general assembly, were doubtless wise, candid and conscientious christian people, and it is inconceivable that they, having officially declared and shown in every way possible that they desired a reunion with the mother church during the hundred years of the existence of the Cumberland Presbyterian Church, should deliberately establish a constitution which forbade such union. And yet this is what we must find to be the truth if the position of appellees is to be upheld. We are told that 'union is death,' and that it is not to be supposed that the fundamental law of a religious corporation makes provision for its destruction. If this proposition be sound, then we are forced to the belief that the Cumberland Presbyterian Church has been seeking self-destruction for nearly a century. Is it true that union is death? If by this rather dramatic statement anything more is meant than that by the consummation of the union the entity known as the Cumberland Presbyterian Church ceased to exist we cannot give our assent to its soundness. It would seem that the very reverse of the proposition is true. As a rule, union means strength and life, and, when applied to such a union as that under consideration, it means a wider horizon of usefulness, a larger field for service and a multiplied opportunity for propagating the gospel and doing the

will of the Master.   Is any congregation destroyed by the union or any presbytery or synod?   Are not all the members still organized under the Presbyterian form of government, with even greater opportunities for usefulness than they formerly had?   Surely this is a strange statement to be made concerning the union of two branches of that great church whose keystone is the belief in the doctrine of the trinity and whose confession of faith contains the following:  'In the unity of the Godhead there are three persons of one substance, power and eternity:  God the Father, Son and Holy Spirit.' "

In *Central University of Kentucky* v. *Walters' Exrs.* 90 S. W. Rep. 1060, a question very similar to the one now under consideration was raised.   In that case Walters had agreed to donate a sum of money to Central University, located at Richmond, Kentucky, and had given his note for the amount of the donation.   Afterwards Central University was united and consolidated with Central College, at Danville, Kentucky, after which Walters instituted an action for cancellation of his note, claiming the consideration for it had failed; that Central University, by being moved from Richmond, Kentucky, and consolidated with Central College, at Danville, Kentucky, had been annihilated, and therefore the maker of the note was entitled to a cancellation.   Justice O'Rear, in disposing of this question, in part said:  "While the statute provides that the old corporations shall cease to exist upon such consolidation, it was never intended to destroy anything except the separate identity,—the shell, as it were,—preserving, however, all that was vital or valuable.   The object was, not to destroy, but to preserve and enlarge.   The result is amalgamation— not annihilation.  *  *  *  The original corporate existence is merely a legal status.   It is not a thing at all.   The power that gave it its so-called existence is competent to change it into a new being, with all the rights and attributes of the old.   No physical phenomenon is involved.

The legislative purpose, and the practical application of it, will not stagger in execution at an imaginary difficulty in harmonizing a thing dead with a thing which is alive. We are of opinion, and hold, that the effect of the consolidation was to continue in the new corporation, Central University of Kentucky, all the franchises and vest in it all the property rights, subject to the terms upon which it was acquired, of the two constituent corporations, the Central University of Kentucky and Central College of Kentucky."

Plaintiffs in error rely with great confidence on the case of *Associate Reformed Church* v. *Trustees of Theological Seminary,* 4 N. J. Ch. (3 Green,) 77, and the case of *Free Church of Scotland* v. *Overtoun,* 4 L. R. (1904) 515, to sustain the position that the plan of reunion adopted by the Cumberland church and the Presbyterian church was a merger and invalid. We do not think either of said cases conclusive of the question at bar, but are of the opinion that the reunion of those two churches was valid, although practically, though not legally, it amounted to a merger.

The case of *Fancy Prairie Congregation of the Cumberland Presbyterian Church* v. *King,* (*post,* p. 120,) has been consolidated with this case and they were argued together orally. In the latter case it is assigned as error, and urged in the briefs, that the decree entered by the circuit court of Menard county in that case is in opposition to the constitution of the State of Illinois and the constitution of the United States, in this: that it deprives plaintiffs in error of their property without due process of law. While that question has not been raised upon this record by an assignment of error or otherwise, as but one opinion will be written in the consolidated case we will say here that we think there is no force in the contention that plaintiffs in error have been deprived of any constitutional right by reason of the reunion between the Cumberland church and the Presby-· terian church. Plaintiffs in error in neither of the consolidated cases, as individuals, have had any interest in the

property involved in either of said cases other than as representatives of the congregation which worshipped in said church property, each of which congregations formed an integral part of the Cumberland church, and if, as we have held, the general assembly of the Cumberland church, in connection with that of the Presbyterian church, had a right to form the reunion, then the title passed to the Presbyterian church. In *Wallace* v. *Hughes, supra,* the court said: "There is no merit in the contention of appellees that the union deprives them of their property. * * * They never had an interest in the property, except as members of the congregation, while it was an integral part of the general ecclesiastical organization known as the Cumberland Presbyterian Church. If the general assembly and the presbyteries of that church had a right to effect the union of which they complain, their interest in the church property can be made to continue only by their remaining in the new organization, which, as we have shown, is the lawful successor of the former organization. If they do not choose to follow the decrees of their church judicatories, they, of course, have the power to forsake the church, but when they leave it they abandon all interest in its property. This was the contract made when they entered the church, and this contract the civil courts will enforce in the only way they can enforce it,—by requiring the property to follow the direction indicated by the judgments of the ecclesiastical tribunals having jurisdiction of the subject matter."

We have endeavored to give this case the consideration which the interests of the parties and the importance of the questions involved demand, and have reached the conclusion that the question whether the reunion between the Cumberland church and the Presbyterian church was a valid reunion was a question for the general assemblies of the two churches to decide, sitting as the highest ecclesiastical judicatories of those churches, and that the general assembly of the Cumberland church, having held the reunion

valid and binding upon the Cumberland church, its judgment is binding upon this court, and that this court must follow the determination of that ecclesiastical court in the determination of the property rights here involved.

The decree of the circuit court will be affirmed.

*Decree affirmed.*